FORD MOTOR CO. *v.* UNITED STATES ET AL.

No. 70–113.   Argued November 18, 1971—
Decided March 29, 1972

Douglas, J., delivered the opinion of the Court, in which Bren-
nan, White, and Marshall, JJ., joined and in which (as to Part I

and part of Part II) BLACKMUN, J., joined. STEWART, J., filed an opinion concurring in the result, *post*, p. 579. BURGER, C. J., *post*, p. 582, and BLACKMUN, J., *post*, p. 595, filed opinions concurring in part and dissenting in part. POWELL and REHNQUIST, JJ., took no part in the consideration or decision of the case.

*Whitney North Seymour* argued the cause for appellant. With him on the briefs were *Eleanor M. Fox, Michael R. Goldenberg, George H. Hempstead III,* and *L. Homer Surbeck.*

*Deputy Solicitor General Friedman* argued the cause for the United States. With him on the brief were *Solicitor General Griswold, Assistant Attorney General McLaren, Wm. Terry Bray, Irwin A. Seibel,* and *William H. McManus.*

*Melvin Lashner* filed a brief for Zenith Vinyl Fabrics Corp. as *amicus curiae.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This is a direct appeal under § 2 of the Expediting Act, 32 Stat. 823, as amended, 15 U. S. C. § 29, from a judgment of the District Court (286 F. Supp. 407, 315 F. Supp. 372), holding that Ford Motor Co. (Ford) violated § 7 of the Celler-Kefauver Antimerger Act [1] by acquiring certain assets from Electric Autolite Co. (Autolite). The assets included the Autolite trade name, Autolite's only

---

[1] Section 7 provides in part:

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 38 Stat. 731, as amended, 64 Stat. 1125, 15 U. S. C. § 18.

spark plug plant in this country (located at New Fostoria, Ohio), a battery plant, and extensive rights to its nation-wide distribution organization for spark plugs and bat-teries. The present appeal[2] is limited to that portion of the judgment relating to spark plugs and ordering Ford to divest the Autolite name and the spark plug plant. The ancillary injunctive provisions are also here for review.

I

Ford, the second-leading producer of automobiles, General Motors, and Chrysler together account for 90% of the automobile production in this country. Though Ford makes a substantial portion of its parts, prior to its acqui-sition of the assets of Autolite it did not make spark plugs or batteries but purchased those parts from inde-pendent companies.

The original equipment of new cars, insofar as spark plugs are concerned, is conveniently referred to as the OE tie. The replacement market is referred to as the *aftermarket*. The independents, including Autolite, fur-nished the auto manufacturers with OE plugs at cost or less, about six cents a plug, and they continued to sell at that price even when their costs increased threefold. The independents sought to recover their losses on OE sales by profitable sales in the *aftermarket* where the requirement of each vehicle during its lifetime is about five replacement plug sets. By custom and practice among mechanics, the *aftermarket* plug is usually the same brand as the OE plug. See generally Hansen & Smith, The Champion Case: What Is Competition?, 29 Harv. Bus. Rev. 89 (1951).

Ford was anxious to participate in this *aftermarket* and, after various efforts not relevant to the present case, concluded that its effective participation in the *after-*

---

[2] We noted probable jurisdiction June 7, 1971. 403 U. S. 903.

*market* required "an established distribution system with a recognized brand name, a full line of high volume service parts, engineering experience in replacement designs, low volume production facilities and experience, and the opportunity to capitalize on an established car population."

Ford concluded it could develop such a division of its own but decided that course would take from five to eight years and be more costly than an acquisition. To make a long story short, it acquired certain assets of Autolite in 1961.

General Motors had previously entered the spark plug manufacturing field, making the AC brand. The two other major domestic producers were independents— Autolite and Champion. When Ford acquired Autolite, whose share of the domestic spark plug market was about 15%, only one major independent was left and that was Champion, whose share of the domestic market declined from just under 50% in 1960 to just under 40% in 1964 and to about 33% in 1966. At the time of the acquisition, General Motors' market share was about 30%. There were other small manufacturers of spark plugs but they had no important share of the market.[3]

The District Court held that the acquisition of Autolite violated § 7 of the Celler-Kefauver Antimerger Act

---

[3] Autolite did not sell all of its assets to Ford and changed the name of the parts of its business that it retained to Eltra Corp. which in 1962 began manufacturing spark plugs in Decatur, Alabama, under the brand name Prestolite. But in 1964 it had only 1.6% of the domestic business. Others included Atlas, sponsored by Standard Oil of New Jersey, with 1.4% of that business, and Riverside, sponsored by Montgomery Ward, with 0.6%. As further stated by the District Court:

"Most of the manufacturing for the private labels among these marketers is done by ELTRA and General Battery and Ceramic Corporation, the only producers of any stature at all after the Big Three." 286 F. Supp. 407, 435.

because its effect "may be substantially to lessen competition." [4]   It gave two reasons for its decision.

First, prior to 1961 when Ford acquired Autolite it had a "pervasive impact on the aftermarket," 315 F. Supp., at 375, in that it was a moderating influence on Champion and on other companies derivatively.   It explained that reason as follows:

> "An interested firm on the outside has a twofold significance.   It may someday go in and set the stage for noticeable deconcentration.   While it merely stays near the edge, it is a deterrent to current competitors.   United States v. Penn-Olin Chemical Co., 378 U. S. 158 . . . (1964).   This was Ford uniquely, as both a prime candidate to manufacture and the major customer of the dominant member of the oligopoly.   Given the chance that Autolite would have been doomed to oblivion by defendant's grassroots entry, which also would have destroyed Ford's soothing influence over replacement prices, Ford may well have been more useful as a potential than it

[4] The words were suggested by the Federal Trade Commission which told the Congress:

"Under the Sherman Act, an acquisition is unlawful if it creates a monopoly or constitutes an attempt to monopolize.   Imminent monopoly may appear when one large concern acquires another, but it is unlikely to be perceived in a small acquisition by a large enterprise.   As a large concern grows through a series of such small acquisitions, its accretions of power are individually so minute as to make it difficult to use the Sherman Act test against them. . . ." S. Rep. No. 1775, 81st Cong., 2d Sess., 5.

The Committee defined the words "may be" as follows:

"The concept of reasonable probability conveyed by these words is a necessary element in any statute which seeks to arrest restraints of trade in their incipiency and before they develop into full-fledged restraints violative of the Sherman Act.   A requirement of certainty and actuality of injury to competition is incompatible with any effort to supplement the Sherman Act by reaching incipient restraints." *Id.*, at 6.

would have been as a real producer, regardless how it began fabrication. Had Ford taken the internal-expansion route, there would have been no illegality; not, however, because the result necessarily would have been commendable, but simply because that course has not been proscribed." 286 F. Supp., at 441.

See also *FTC* v. *Procter & Gamble Co.*, 386 U. S. 568; *United States* v. *Penn-Olin Chemical Co.*, 378 U. S. 158.

Second, the District Court found that the acquisition marked "the foreclosure of Ford as a purchaser of about ten per cent of total industry output." 315 F. Supp., at 375. The District Court added:

"In short, Ford's entry into the spark plug market by means of the acquisition of the factory in Fostoria and the trade name 'Autolite' had the effect of raising the barriers to entry into that market as well as removing one of the existing restraints upon the actions of those in the business of manufacturing spark plugs.

"It will also be noted that the number of competitors in the spark plug manufacturing industry closely parallels the number of competitors in the automobile manufacturing industry and the barriers to entry into the auto industry are virtually insurmountable at present and will remain so for the foreseeable future. Ford's acquisition of the Autolite assets, particularly when viewed in the context of the original equipment (OE) tie and of GM's ownership of AC, has the result of transmitting the rigidity of the oligopolistic structure of the automobile industry to the spark plug industry, thus reducing the chances of future deconcentration of the spark plug market by forces at work within that market." *Ibid.*

See also *FTC* v. *Consolidated Foods Corp.*, 380 U. S. 592; *Brown Shoe Co.* v. *United States*, 370 U. S. 294; *United States* v. *Du Pont & Co.*, 353 U. S. 586.

We see no answer to that conclusion if the letter and spirit of the Celler-Kefauver Antimerger Act [5] are to be honored. See *United States* v. *Philadelphia National Bank*, 374 U. S. 321, 362–363; *United States* v. *Penn-Olin Chemical Co.*, 378 U. S., at 170–171; *Brown Shoe Co.* v. *United States*, 370 U. S., at 311–323.

It is argued, however, that the acquisition had some beneficial effect in making Autolite a more vigorous and

---

[5] Congressman Celler in testifying for the Celler-Kefauver bill that was the 1950 amendment to § 7 of the Clayton Act said:

"[T]he worth of the individual is the worth of the Nation; no more and no less. That which strengthens the individual bolsters the Nation; that which dwarfs the individual belittles the Nation." Hearing on H. R. 988 *et seq.* before Subcommittee No. 3 of the House Committee on the Judiciary, 81st Cong., 1st Sess., ser. 10, pp. 14–15 (1949).

Senator Kefauver spoke in the same vein:

"[I]f our democracy is going to survive in this country we must keep competition, and we must see to it that the basic materials and resources of the country are available to any little fellow who wants to go into business.

"Charts and statistics will show that every year there is more and more concentration, with more and more corporations purchasing out their competitors, so that unless this trend is halted we are going to come to a place where the basic industries and business of America are controlled by a very, very small group of a small number of corporations.

"We have already reached that point in a great many of our basic industries. The evil of that course is quite apparent. When people lose their economic freedom, they lose their political freedom.

"When the destiny of people over the land is dependent upon the decision of two or three people in a central office somewhere, then the people are going to demand that the Government do something about it.

"When it reaches that stage, it is going to result in statism of one sort or another; and whichever sort it may be, one is equally as bad as another, as I see it." *Id.*, at 12.

effective competitor against Champion and General Motors than Autolite had been as an independent. But what we said in *United States* v. *Philadelphia National Bank, supra,* disposes of that argument. A merger is not saved from illegality under § 7, we said,

> "because, on some ultimate reckoning of social or economic debits and credits, it may be deemed beneficial. A value choice of such magnitude is beyond the ordinary limits of judicial competence, and in any event has been made for us already, by Congress when it enacted the amended § 7. Congress determined to preserve our traditionally competitive economy. It therefore proscribed anticompetitive mergers, the benign and the malignant alike, fully aware, we must assume, that some price might have to be paid." 374 U. S., at 371.

Ford argues that the acquisition left the marketplace with a greater number of competitors. To be sure, after Autolite sold its New Fostoria plant to Ford, it constructed another in Decatur, Alabama, which by 1964 had 1.6% of the domestic business. Prior to the acquisition, however, there were only two major independent producers and only two significant purchasers of original equipment spark plugs. The acquisition thus aggravated an already oligopolistic market.

As we indicated in *Brown Shoe Co.* v. *United States,* 370 U. S., at 323–324:

> "The primary vice of a vertical merger or other arrangement tying a customer to a supplier is that, by foreclosing the competitors of either party from a segment of the market otherwise open to them, the arrangement may act as a 'clog on competition,' *Standard Oil Co. of California* v. *United States,* 337 U. S. 293, 314, which 'deprive[s] . . . rivals of a fair opportunity to compete.' H. R. Rep. No. 1191,

81st Cong., 1st Sess. 8. Every extended vertical arrangement by its very nature, for at least a time, denies to competitors of the supplier the opportunity to compete for part or all of the trade of the customer-party to the vertical arrangement."

Moreover, Ford made the acquisition in order to obtain a foothold in the *aftermarket*. Once established, it would have every incentive to perpetuate the OE tie and thus maintain the virtually insurmountable barriers to entry to the *aftermarket*.

## II

The main controversy here has been over the nature and degree of the relief to be afforded.

During the year following the District Court's finding of a § 7 violation, the parties were unable to agree upon appropriate relief. The District Court then held nine days of hearings on the remedy and, after full consideration, concluded that divestiture and other relief were necessary.

The OE tie, it held, was in many respects the key to the solution since the propensity of the mechanic in a service station or independent garage is to select as a replacement the spark plug brand that the manufacturer installed in the car. The oligopolistic structure of the spark plug manufacturing industry encourages the continuance of that system. Neither GM nor Autolite sells private-label plugs. It is obviously in the self-interest of OE plug manufacturers to discourage private-brand sales and to encourage the OE tie. There are findings that the private-brand sector of the spark plug market will grow substantially in the next decade because mass merchandisers are entering this market in force. They not only sell all brands over the counter but also have service bays where many carry only spark plugs of their own proprietary brand. It is anticipated that by 1980

the total private brand portion of the spark plug market may then represent 17% of the total *aftermarket*. The District Court added:

> "To the extent that the spark [plug] manufacturers are not owned by the auto makers, it seems clear that they will be more favorably disposed toward private brand sales and will compete more vigorously for such sales. Also, the potential entrant continues to have the chance to sell not only the private brand customer but the auto maker as well." 315 F. Supp., at 378.

Accordingly the decree

(1) enjoined Ford for 10 years from manufacturing spark plugs,

(2) ordered Ford for five years to purchase one-half of its total annual requirement of spark plugs from the divested plant under the "Autolite" name,

(3) prohibited Ford for the same period from using its own trade names on plugs,

(4) protected New Fostoria, the town where the Autolite plant is located, by requiring Ford to continue for 10 years its policy of selling spark plugs to its dealers at prices no less than its prevailing minimum suggested jobbers' selling price,[6]

(5) protected employees of the New Fostoria plant by ordering Ford to condition its divestiture sale on the purchaser's assuming the existing wage and pension obligations and to offer employment to any employee displaced by a transfer of nonplug operations from the divested plant.[7]

---

[6] The District Court found this provision necessary in order to assemble an adequate distribution system for the *aftermarket*. Without it, service stations and independent jobbers would be unable to compete with franchised car dealers for the replacement business. Ford does not challenge this provision in this Court.

[7] Ford does not challenge this ancillary portion of the District Court decree protecting the employees of the New Fostoria plant.

The relief in an antitrust case must be "effective to redress the violations" and "to restore competition." [8] *United States* v. *Du Pont & Co.,* 366 U. S. 316, 326. The District Court is clothed with "large discretion" to fit the decree to the special needs of the individual case. *International Salt Co.* v. *United States,* 332 U. S. 392, 401; *United States* v. *Du Pont & Co.,* 353 U. S., at 608; *United States* v. *Crescent Amusement Co.,* 323 U. S. 173, 185.

Complete divestiture is particularly appropriate where asset or stock acquisitions violate the antitrust laws. *United States* v. *Du Pont & Co., supra,* at 328–335; *United States* v. *Crescent Amusement Co., supra,* at 189; *Schine Chain Theatres* v. *United States,* 334 U. S. 110, 128; *United States* v. *El Paso Gas Co.,* 376 U. S. 651.

Divestiture is a start toward restoring the pre-acquisition situation. Ford once again will then stand as a large industry customer at the edge of the market with

---

[8] The suggestion that antitrust "violators may not be required to do more than return the market to the *status quo ante*," *post,* at 590, is not a correct statement of the law. In *United States* v. *Paramount Pictures, Inc.,* 334 U. S. 131, we sustained broad injunctions regulating motion picture licenses and clearances which were not related to the *status quo ante. Reynolds Metals Co.* v. *FTC,* 114 U. S. App. D. C. 2, 309 F. 2d 223 (1962), concerned the enforcement powers of the Federal Trade Commission, not the equitable powers of the District Court.

Section 4 of the Sherman Act, 15 U. S. C. § 4, and § 15 of the Clayton Act, 15 U. S. C. § 25, empower "the Attorney General, to institute proceedings in equity to prevent. and restrain . . . violations" of the antitrust laws. The relief which can be afforded under these statutes is not limited to the restoration of the *status quo ante.* There is no power to turn back the clock. Rather, the relief must be directed to that which is "necessary and appropriate in the public interest *to eliminate the effects* of the acquisition offensive to the statute," *United States* v. *Du Pont & Co.,* 353 U. S. 586, 607 (emphasis added), or which will *"cure the ill effects* of the illegal conduct, and *assure the public freedom from* its continuance." *United States* v. *United States Gypsum Co.,* 340 U. S. 76, 88 (emphasis added).

a renewed interest in securing favorable terms for its substantial plug purchases. Since Ford will again be a purchaser, it is expected that the competitive pressures that existed among other spark plug producers to sell to Ford will be re-created. The divestiture should also eliminate the anticompetitive consequences in the *aftermarket* flowing from the second largest automobile manufacturer's entry through acquisition into the spark plug manufacturing business.

The divested plant is given an incentive to provide Ford with terms which will not only satisfy the 50% requirement provided for five years by the decree but which even after that period may keep at least some of Ford's ongoing purchases. The divested plant is awarded at least a foothold in the lucrative *aftermarket* and is provided an incentive to compete aggressively for that market.

As a result of the acquisition of Autolite, the structure of the spark plug industry changed drastically, as already noted. Ford, which before the acquisition was the largest purchaser of spark plugs from the independent manufacturers, became a major manufacturer. The result was to foreclose to the remaining independent spark plug manufacturers the substantial segment of the market previously open to competitive selling and to remove the significant procompetitive effects in the concentrated spark plug market that resulted from Ford's position on the edge of the market as a potential entrant.

To permit Ford to retain the Autolite plant and name and to continue manufacturing spark plugs would perpetuate the anticompetitive effects of the acquisition.[9]

---

[9] "[I]t would be a novel, not to say absurd, interpretation of the Anti-Trust Act to hold that after an unlawful combination is formed and has acquired the power which it has no right to acquire, namely, to restrain commerce by suppressing competition, and is proceeding to use it and execute the purpose for which the combination was formed, it must be left in possession of the power that it has acquired,

The District Court rightly concluded that only divestiture would correct the condition caused by the unlawful acquisition.

A word should be said about the other injunctive provisions. They are designed to give the divested plant an opportunity to establish its competitive position. The divested company needs time so it can obtain a foothold in the industry. The relief ordered should "cure the ill effects of the illegal conduct, and assure the public freedom from its continuance," *United States* v. *United States Gypsum Co.*, 340 U. S. 76, 88, and it necessarily must "fit the exigencies of the particular case." *International Salt Co.* v. *United States*, 332 U. S., at 401. Moreover, "it is well settled that once the Government has successfully borne the considerable burden of establishing a violation of law, all doubts as to the remedy are to be resolved in its favor." *United States* v. *Du Pont & Co.*, 366 U. S., at 334.

Ford concedes that "[i]f New Fostoria is to survive, it must for the foreseeable future become and remain the OE supplier to Ford and secure and retain the benefits of such OE status in sales of replacement plugs." The ancillary measures ordered by the District Court are designed to allow Autolite to re-establish itself in the OE and replacement markets and to maintain it as a viable competitor until such time as forces already at work within the marketplace weaken the OE tie. Thus Ford is prohibited for 10 years from manufacturing its own plugs.[10] But in five years it can buy its plugs from any source and use its name on OE plugs.

---

with full freedom to exercise it." *Northern Securities Co.* v. *United States*, 193 U. S. 197, 357.

[10] Ford argues that the 10-year prohibition on its manufacture of spark plugs will lessen competition because it will remove a potential competitor from the marketplace. This prohibition, however, is merely a step toward the restoration of the *status quo ante*, and is, moreover, necessary for Autolite to re-establish itself.

But prior to that time Ford cannot use or market plugs bearing the Ford trade name. In view of the importance of the OE tie, if Ford were permitted to use its own brand name during the initial five-year period, there would be a tendency to impose the oligopolistic structure of the automotive industry on the replacement parts market and the divested enterprise might well be unable to become a strong competitor. Ford argues that any prohibition against the use of its name is permissible only where the name deceives or confuses the public.[11] But this is not an unfair competition case. The temporary ban on the use of the Ford name is designed to restore the pre-acquisition competitive structure of the market.

The requirement that, for five years, Ford purchase at

---

[11] Ford also argues that the right to its own trade name is a constitutionally protected property right (cf. *Howe Scale Co.* v. *Wyckoff, Seamans & Benedict,* 198 U. S. 118; *Brown Chemical Co.* v. *Meyer,* 139 U. S. 540; *United States* v. *Tropiano,* 418 F. 2d 1069, 1076 (CA2 1969)), and that the remedial provision of § 15 of the Clayton Act should not be construed to limit the use of this right. Even on that assumption, we could not accept the conclusion advanced by Ford.

Even constitutionally protected property rights such as patents may not be used as levers for obtaining objectives proscribed by the antitrust laws. *E. g., Besser Mfg. Co.* v. *United States,* 343 U. S. 444, 448–449; *Morton Salt Co.* v. *Suppiger Co.,* 314 U. S. 488. Here, the use by Ford of its trade name would perpetuate the OE tie and would have the prohibited effect of hindering the re-entry of Autolite to the spark plug market as a viable competitor.

"The trade mark may become a detrimental weapon if it is used to serve a harmful or injurious purpose. If it becomes a tool to circumvent free enterprise and unbridled competition, public policy dictates that the rights enjoyed by its ownership be kept within their proper bounds. If a trade mark may be the legal basis for allocating world markets, fixing of prices, restricting competition, the unfailing device has been found to destroy every vestige of inhibition set up by the Sherman Act." *United States* v. *Timken Roller Bearing Co.,* 83 F. Supp. 284, 316 (ND Ohio 1949), aff'd, 341 U. S. 593 (1951).

least half of its spark plug requirements from the divested company under the Autolite label is to give the divested enterprise an assured customer while it struggles to be re-established as an effective, independent competitor.

It is suggested, however, that "the District Court's orders assured that Ford could not begin to have brand name success in the replacement market for at least 10 to 13 years." *Post,* at 591. This conclusion distorts the effect of the District Court decree and the nature of the spark plug industry. Ford's own studies indicate that it would take five to eight years for it to develop a spark plug division internally. A major portion of this period would be devoted to the development of a viable position in the aftermarket. The five-year prohibition on the use of its own name and the 10-year limitation on its own manufacturing mesh neatly to allow Ford to establish itself in the *aftermarket* prior to becoming a manufacturer while, at the same time, giving Autolite the opportunity to re-establish itself by providing a market for its production. Thus, the District Court's decree delays for only two to five years the date on which Ford may become a manufacturer with an established share of the *aftermarket.* Given the normal five-to-eight-year lead time on entry through internal expansion, the District Court's decree does not significantly lessen Ford's moderating influence as a potential entrant on the edge of the market. Moreover, in light of the interim benefits this ancillary relief will have on the re-establishment of Autolite as a viable competitor and of Ford as a major purchaser, we cannot agree with the characterization of the relief as "harshly restrictive," *post,* at 595, or the assertion that the decree, in any practical and significant sense, "prohibit[s] Ford from entering the market through internal expansion." *Post,* at 592.

Antitrust relief should unfetter a market from anticompetitive conduct and "pry open to competition a

market that has been closed by defendants' illegal restraints." *International Salt Co.* v. *United States,* 332 U. S., at 401. The temporary elimination of Ford as a manufacturer of spark plugs lowers a major barrier to entry to this industry. See C. Kaysen & D. Turner, Antitrust Policy—An Economic and Legal Analysis 116 (1959). Forces now at work in the marketplace may bring about a deconcentrated market structure and may weaken the onerous OE tie. The District Court concluded that the forces of competition must be nurtured to correct for Ford's illegal acquisition. We view its decree as a means to that end.[12]

The thorough and thoughtful way the District Court considered all aspects of this case, including the nature of the relief, is commendable. The drafting of such a decree involves predictions and assumptions concerning future economic and business events. Both public and private interests are involved; and we conclude that the District Court with a single eye to the requirements of § 7 and the violation that was clearly established made a reasonable judgment on the means needed to restore and encourage the competition adversely affected by the acquisition.

*Affirmed.*

MR. JUSTICE POWELL and MR. JUSTICE REHNQUIST took no part in the consideration or decision of this case.

---

[12] The District Court decree thus implements the congressional judgment in favor of atomized markets reflected in the Celler-Kefauver Antimerger Act:

"But we cannot fail to recognize Congress' desire to promote competition through the protection of viable, small, locally owned businesses. Congress appreciated that occasional higher costs and prices might result from the maintenance of fragmented industries and markets. It resolved these competing considerations in favor of decentralization. We must give effect to that decision." *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 344.

MR. JUSTICE STEWART, concurring in the result.

The spark plug industry as it stood prior to Ford's acquisition of Autolite was hardly characterized by vigorous competition. For 25 years, the industry had consisted of AC, owned by and supplying original equipment (OE) plugs to General Motors; Champion, independent and supplying Ford; Autolite, independent and supplying Chrysler; and a number of small producers who had no OE sales and only a minuscule share of the after-market.[1] The habit among mechanics of installing replacement plugs carrying the same brand as the automobile's original plugs, reinforced by the unwillingness of service stations to stock more than two or three brands,[2] made possible the "OE tie," which rendered any large-scale entry into the aftermarket virtually impossible without first obtaining a large OE customer. Moreover, price competition was minimal, both in the OE market (where any reduction in the six-cent price would immediately be matched by rivals), and in the aftermarket (where spark plugs accounted for such a small percentage of the normal tuneup charge that price differentials did not have a significant impact upon consumer choice).

The District Court found that the acquisition of Autolite's spark plug assets by Ford further lessened competition in the industry in two ways: it foreclosed Ford as a potential purchaser of spark plugs from independent producers, and it eliminated what the District Court found to have been Ford's "moderating effect" upon Champion's pricing policies in the aftermarket. These

---

[1] Both Champion and Autolite supplied OE plugs to American Motors, which in 1961 had roughly 5% of the domestic automobile market.

[2] According to a 1966 survey, only 11% of all metropolitan area service stations stocked any brand of spark plug other than Champion, AC, or Autolite, and only 30% stocked all three of the leading brands.

findings standing alone might provide a basis for conclud-
ing that the acquisition violated § 7, but, as THE CHIEF
JUSTICE demonstrates in his dissenting opinion, *post*, at
591–592, the remedy ordered will not restore the pre-
acquisition market forces upon which the District Court
focused. For, under the court's injunctions, Ford will
be neither a potential market entrant, nor a potential
purchaser of half its OE requirements from producers
other than Autolite, for a substantial period of time after
the divestiture takes place.

In my judgment, both the finding of a § 7 violation
and the remedy ordered may be better rationalized in
terms of probable future trends in the spark plug market,
visible at the time of the acquisition. The District Court
observed that "a court cannot shut its eyes to con-
temporary or predictable factors conducive to change in
the competitive structure." 286 F. Supp. 407, 442. This
was a proper inquiry because we have held that § 7 "re-
quires not merely an appraisal of the immediate impact
of the merger upon competition, but a prediction of its
impact upon competitive conditions in the future."
*United States* v. *Philadelphia National Bank,* 374 U. S.
321, 362.[3]

---

[3] Ford argues that the acquisition allowed Autolite to compete
more effectively against the two larger brands, Champion and AC.
Since this argument is addressed to the effect of the acquisition upon
*competition,* the Court obviously provides no answer to the argu-
ment when it quotes *Philadelphia National Bank* for the proposition
that arguments *unrelated* to the merger's effect upon *competition*
are irrelevant in a § 7 case. But Ford's arguments that Autolite was
a more effective competitor after the acquisition rests principally
on the fact that Autolite's market share increased after 1961 while
Champion's decreased. This development, however, can be attributed
for the most part to the fact that Autolite now provides OE plugs
to Ford, rather than to the smaller Chrysler. Autolite's increased
market share, therefore, is more likely attributable to the OE tie
than to any increase in its competitive vigor.

The District Court found that the growth of service-centers operated by mass merchandisers carrying private label brands might eventually loosen the OE tie and the tight oligopoly in the spark plug market that it had fostered. Had Ford entered the market through internal expansion, either Champion or Autolite would have been left without an OE entry, but would nevertheless have owned an established brand name with an existing distribution system, together with a large production capacity. Even the threat of being so stranded, not to mention its realization, would have given both Champion and Autolite an incentive to compete as suppliers to private label sellers, as these sellers began to represent a significant share of the market, and to undermine the OE tie. Ford's acquisition of Autolite did more than foreclose it as a potential OE customer, or eliminate its "moderating effect" upon Champion's pricing policies: it eliminated one of the only two independent producers with a sufficient share of the aftermarket to give it a chance to compete effectively without an OE tie. Thus, the acquisition had the probable effect of indefinitely postponing the day when existing market forces could produce a measurable deconcentration in the market.

While the District Court did not justify the divestiture in precisely these terms, I think its prediction of future trends in the spark plug industry is an adequate basis to support the remedy ordered. THE CHIEF JUSTICE's opinion, *post,* at 591–592, is correct in its assertion that the ancillary injunctions are anticompetitive in the short run, and that the District Court took extraordinary measures to mother the divested producer for the next decade. But I cannot say that these injunctions are not reasonably calculated to establish the new Autolite producer as a viable firm and thus to restore the pre-acquisition market structure, insofar as it is now possible to do so. A divestiture decree

without ancillary injunctions would not automatically restore the *status quo ante,* as THE CHIEF JUSTICE's opinion seems to assume. The Electric Autolite Company, from which Ford acquired the assets in question here, will not be recreated by the divestiture, and it is reasonable to assume that a new owner of the Autolite trade name and the New Fostoria plant will require a period of time to become as effective a competitor as was Electric Autolite prior to the acquisition.

Though the economics of the market are such that the divestiture cannot be assured of success, it does at least have a chance of bringing increased competition to the spark plug industry. And while divestiture remedies in § 7 cases have not enjoyed spectacular success in the past, remedies short of divestiture have been uniformly unsuccessful in meeting the goals of the Act. See Elzinga, The Antimerger Law: Pyrrhic Victories, 12 J. Law & Econ. 43 (1969).

MR. CHIEF JUSTICE BURGER, concurring in part and dissenting in part.

In addition to requiring divestiture of Autolite, the District Court made ancillary injunctive provisions that go far beyond any that have been cited to the Court. Ford is forbidden to manufacture spark plugs for 10 years; Ford is ordered to purchase one-half of its total annual requirement of spark plugs from the divested company under the "Autolite" name, and Ford is forbidden for the same period to use its own trade name on any spark plugs. These provisions are directed to prevent Ford from making an independent entry into the spark plug market and, in effect, to require it to subsidize Autolite for a period of time. Despite the Draconian quality of this restriction on Ford, I can find no justification in the District Court's findings for this

remedy. I dissent from the broad sweep of the District Court's remedial decree. I would remand for further consideration of the remedial aspects of this case.

An understanding of the District Court's findings as to the spark plug market shows three reasons why it was in error in requiring Ford to support Autolite. First, the court did *not* find that the weakness of an independent Autolite's competitive position resulted from Ford's acquisition. Rather, a reading of its findings makes apparent that the precariousness of Autolite's expected post-divestment position results from pre-existing forces in the market. Therefore, the drastic measures employed to strengthen Autolite's position at Ford's expense cannot be justified as a remedy for any wrong done by Ford. Second, the remedy will perpetuate for a time the very evils upon which the District Court based a finding of an antitrust violation. Third, the court's own findings indicate that the remedy is not likely to secure Autolite's competitive position beyond the termination of the restrictions. Therefore, there is no assurance that the judicial remedy will have the desired impact on long-run competition in the spark plug market.

The Court makes two critical errors in order to avoid the effect of this reasoning. It rejects the factfinding by the District Court in order to uphold its remedial order; and it repeats that court's error by discussing the assistance necessary to restore Autolite to the *status quo ante* without ever delineating that prior state of affairs or indicating how Ford, by acquiring Autolite and holding it for a number of years, had undermined its ability to reassume its former independent competitive position.

The District Court made extensive findings on the nature of the spark plug market. Some of these findings appear in the Court's opinion, but some factors that

seem crucial to me are either omitted or not adequately set forth. Therefore I will sketch these findings at some risk of repetition.

Beyond doubt, the spark plug market has been overwhelmingly dominated by three manufacturers for a long period: AC, owned by General Motors, which had about 30% of the market in 1961; Champion, which had supplied Ford since 1910 and had approximately 50% of the market in 1961; and Autolite, which had supplied Chrysler since 1941 and had 15% of the market in 1961. Together these three companies had over 95% of the total market in 1961.

The reason for the continued domination of the market by the three big plug manufacturers is the pervasive feature of the plug market known as the "OE (original equipment) tie." This denominates the phenomenon that mechanics who replace spark plugs in a car engine have tended, almost exclusively, to use the brand of plug installed by the auto builder as original equipment. Though not required by spark plug technology, mechanics have followed this practice because of a strong desire to avoid any chance of injuring an engine by putting a mismatched plug into it. Further, because plugs are low-profit items, those who install them tend to carry an inventory of a small number of brands. Most carry only two and some carry three brands, and they choose the brands installed by the big auto manufacturers as original equipment. Thus, it takes a position as supplier to a large auto maker to gain recognition in the spark plug replacement market. The Government conceded in the District Court, for instance, that American Motors, with 5% of the auto market, would not be able to create market acceptance for an independent brand of plug by installing it as original equipment in its cars.

Because of the competitive importance of having their plugs installed as original equipment by one of the three

auto companies, plug manufacturers have over a long period been willing to sell OE plugs for initial installation by auto manufacturers at a price below their production cost. The longstanding price for OE plugs, about 6 cents, is now approximately one-third of the cost of producing these plugs. Such below-cost selling is profitable for the plug companies because of the foothold it gives them in competing for the normal five or six sets of replacement plugs necessary in the lifespan of an automobile. This pricing policy has been partially responsible for the semipermanent relations between the plug manufacturers and the auto manufacturers: it is only those plug companies that profit from the OE tie over the long run that can afford this below-cost sale to the auto companies.

The strength of the OE tie is demonstrated by the inability of well-known auto supply manufacturers to gain a significant share of the spark plug market in the absence of an OE tie. As the District Court found, no company without the OE tie

> "ever surpassed the 2% level. Several have come and gone. Firestone Tire and Rubber Company merchandised 'Firestone' replacements for 35 years before it gave up in 1964. Although it owned some 800 accessory stores and successfully wholesaled other items to more than 50,000 shops and filling stations, it could not surmount the patent discrimination against brands not blessed with Detroit's approbation. Goodyear Tire and Rubber Company quit in only three years. Globe Union, a fabricator which had barely 1% of the nation's shipments, withdrew in 1960." 286 F. Supp. 407, 434–435.

Two small manufacturers survive, producing plugs for private-label brands. Thus "Atlas" plugs, sponsored by

the Standard Oil companies, has 1.4% of the replacement market; "Prestolite" and Sears, Roebuck's "Allstate" each have 1.2%; and Montgomery Ward's "Riverside" label has 0.6% of the replacement market.

An independent entry into the plug market by Ford, with the expected substitution of its own plugs as original equipment in its cars, would have necessarily deprived one of the two significant independent plug producers of its OE status. The District Court found that, because of the importance of the OE tie, the plug producer deprived of this support would most likely have lost any significant position in the market.[1] Autolite, with only 15% of the market before the acquisition, would certainly have lost any significant position in the market if an independent entry by Ford had led Chrysler to shift its patronage from Autolite to Champion. The District Court asserted that a Champion without OE status would have had some chance of maintaining a significant market position because of its size, although it gave no reason for thinking Champion's size immunized it from dependence on OE status. Before 1961, Champion had just under 50% of the market. As a result of Champion's move to Chrysler in 1961, its position in the market dropped to 33% by 1966. The District Court found no basis for predicting which of the two big independents would have won such a competition for continued OE status.

Thus, an independent entry by Ford would not likely have increased the number of significant competitors in the spark plug market. Rather, it would simply have substituted Ford for one of the two significant independent manufacturers. The result of this expectation

---

[1] Of course, the decline would take a number of years, since it would be spread over the life of the cars on the road bearing the producer's plugs as original equipment—probably five to eight years.

is that the District Court did not base its finding of illegality on the ground typically present when a potential entrant enters an oligopolistic market by acquisition rather than internal expansion, *i. e.,* that such a move has deprived the market of the pro-competitive effect of an increase in the number of competitors. Here an independent entry would not have increased the number of competitors but simply would have exchanged one competitor for another. In noting this paradoxical fact, the District Court concluded that "Ford may well have been more useful as a potential than it would have been as a real producer, regardless how it began fabrication." [2] 286 F. Supp., at 441.

Not finding that Ford's entry by acquisition had deprived the spark plug market of any pro-competitive effect of an independent entry, the District Court relied on two other grounds for finding a violation of the antitrust laws. First, it concluded that as a potential entrant on the edge of the market which was also a major purchaser in the market, Ford exercised a "moderating" influence on the market; the second basis for determining the acquisition illegal was the finding that the acqui-

---

[2] MR. JUSTICE STEWART, concurring in the result, relies on factual assumptions that seem to me directly contrary to findings made by the District Court. While that court found future developments might arise in the plug market that would enable an independent Autolite without OE status to survive, it also found that an independent entry by Ford in 1960, or even as of the date of the projected divestiture, would have left Autolite doomed because the market would not yet be ready to offer it an independent niche. By slighting these findings, MR. JUSTICE STEWART is able to avoid the question whether Ford should have to bear the burden of maintaining Autolite's life until a time when market changes might support it when it is clear that an earlier independent entry by Ford would have left it moribund. He further overlooks the problems discussed below as to the unlikelihood of Autolite's success, its fixed-production needs versus the small size of the market free of the OE tie.

sition "foreclosed" other companies from competing for the business of supplying Ford with spark plugs.

With respect to Autolite itself, the District Court made several relevant findings. First, it found that Autolite is a fixed-production plant. In other words, it can be profitable only turning out approximately the number of plugs it now manufactures. It could not, for instance, reduce its production by half and sell that at a profit. Second, it made extensive findings with respect to Autolite's distribution system:

> "Ford received six regional offices, personnel and a list of Electric Autolite's warehousers and jobbers. All of these have been and still are at liberty to deal with anyone they wish. Each old direct account had to be visited individually and, if it consented, be re-signed by defendant [Ford]. Within a few months, 52 did enter into new ignition contracts. However, 50 of these for the previous year had also been . . . [distributors of other Ford products]. By mid-1966, direct accounts totaled 156, of which 104 in 1960 had been pledged to neither Ford nor Autolite. The same bloc of 50 had been committed to both. The net increase traceable with any semblance of accuracy to the acquisition is two first-layer middlemen . . . ." 286 F. Supp., at 422.

As to difficulties that a divested Autolite might have in establishing an independent distribution system, the District Court mentioned only one: [3] if Ford were to offer its own plugs to its car dealers at a fairly low price, one which independent jobbers could not meet, Autolite

---

[3] The District Court made no mention of whether a divested Autolite would have the six regional offices and personnel that it had in 1960. Given the District Court's solicitude for Autolite's health, I can only assume that it expected Autolite to be sent out with whatever it had brought in.

would have difficulty independently establishing its distribution system. The jobbers would be less interested in handling Autolite's line since the Ford dealers would not want Autolite at the jobbers' price and, with this demand cut out, the jobbers would be less interested in pushing Autolite generally.

There is another set of relevant facts found by the District Court. The District Judge found that "there is a rising wind of new forces in the spark plug market which may profoundly change it." 315 F. Supp. 372, 377. On the basis of the testimony of an executive of one of the producers of plugs for private labels, the court found that the private-brand sector would grow during the next 10 years. This highly speculative observation of the District Court was based on a finding that the mass merchandisers are beginning to enter the plug marketing field in force. Not only do the mass merchandisers market private-brand plugs over the counter, but they are also building service bays. And in these bays many carry only their own proprietary brand of spark plugs. This witness predicted that the mass merchandisers would increase their share of the aftermarket from 4.4% to 10% by 1980. He further predicted that oil companies would enter the replacement market, resulting in a total of 17% of the replacement market being supplied by private-label plugs by 1980. The court concluded that these forces "may well lead to [the market's] eventual deconcentration by increasing the number of potential customers for a new entrant into the plug manufacturing business and reducing the need for original equipment identification." 315 F. Supp., at 378.

In its separate opinion on remedies, the District Court correctly stated the relevant law; the purpose, and limit of antitrust remedies, is to

"free these forces [within the market] from the unlawful restraint imposed upon them so that they

may run their natural course." 315 F. Supp., at 377.

The violators may not be required to do more than return the market to the *status quo ante*. See *United States* v. *Paramount Pictures, Inc.*, 334 U. S. 131, 152–153 (1948); *Reynolds Metals Co.* v. *FTC*, 114 U. S. App. D. C. 2, 309 F. 2d 223 (1962) (Burger, J.). Applying this general provision to the instant situation, the District Court correctly stated:

> "The court wishes to note here that although it finds that divestiture is the only effective remedy, it does not agree with the Government that the remedy should be affirmatively designed to 'break the OE tie.' The remedy is designed to correct the violations of Section 7 found by the court. The OE tie, as such, does not violate Section 7." 315 F. Supp., at 378.

The District Court then concluded that, in addition to divestiture of the Autolite plant and trade name, certain injunctive provisions were required "to give [Autolite] an opportunity to establish its competitive position." *Ibid.* It therefore ordered that Ford be prohibited from manufacturing spark plugs for a period of 10 years. It further ordered that for a period of five years Ford would be *required* to purchase one-half of its total annual needs of spark plugs from Autolite, bearing the Autolite label. For this five-year period Ford was also ordered not to use or market a spark plug under a trade name owned by or licensed to it. The effect of these orders was twofold. They assured Autolite of a purchaser for a large part of its production for five years. And they prevented Ford from immediately entering the competition for a share of the aftermarket with a plug under its own name; it could not even label a plug under its own name for five years and could not manufacture its own plug for 10 years.

Given the findings of the court that even with the status of supplier of original equipment (with the company's own brand name on plugs) to a major auto manufacturer it would take a new entrant into the spark plug market five to eight years to establish a position for its brand in the replacement market, the District Court's orders assured that Ford could not begin to have brand-name success in the replacement market for at least 10 to 13 years.[4]

In my view these drastic remedial provisions are not warranted by the court's findings as to the grounds on which Ford's acquisition violated the antitrust laws. Further, in light of the District Court's own factfindings, these remedies will have short run anticompetitive impact and they give no assurance that they will succeed in allowing Autolite to establish its competitive position.

The remedial provisions are unrelated to restoring the *status quo ante* with respect to the two violations found by the District Court, the ending of Ford's status as a potential entrant with a moderating influence on the market and the foreclosure of a significant part of the plug market. Indeed, the remedies may well be anti-competitive in both respects. First, the District Court's order actually undercuts the moderating influence of Ford's position on the edge of the market. It is the

---

[4] The majority opinion errs in its evaluation, *ante,* at 577, of the effect of the restrictions on Ford's ability to establish itself in the aftermarket. The District Court opinion makes clear that gaining a position in the replacement market takes five to eight years after the brand of plugs is first installed as original equipment: 18 months to three years before the first cars need plug replacements plus several annual car populations requiring this brand before service centers would be motivated to stock it. Thus, the prohibition against Ford's using its own name for five years delays the beginning of an independent Ford entry and results in assuring that Ford could not gain a position in the aftermarket for 10 to 13 years after the effective date of the divestiture.

possibility that a company on the sidelines will enter a market through internal expansion that has a moderating influence on the market. By prohibiting Ford from entering the market through internal expansion, therefore, the remedy order wipes out, for the duration of the restriction, the pro-competitive influence Ford had on the market prior to its acquisition of Autolite. Second, the Court's order does not fully undo the foreclosure effect of the acquisition. Divestment alone would return the parties to the *status quo ante*. Ford would then be free to deal with Autolite or another plug producer or to enter the market through internal expansion. Yet the Court has ordered Ford to buy at least half its requirements from Autolite for five years. Thus, the order itself forecloses part of Ford's needs from the forces of competition.

The above problems might be minor if the District Court's remedy were justifiable in terms of returning Autolite to the *status quo ante* by overcoming some harm to its ability to compete accomplished by Ford's acquisition. But on this issue the District Court opinion and the majority of this Court are confused. Although the District Court asserted that Autolite needed the aid of its injunctive remedies to establish its competitive position, the court made no findings in its remedy opinion as to the source of Autolite's competitive weakness. Therefore it never reached the issue whether the source of weakness had anything to do with the violations attributed to Ford. Instead, the court's opinion proceeded from the recognition of competitive problems immediately to the prescription of a remedy.

In fact, a fair reading of the findings of the District Court shows that the acquisition did not injure Autolite's competitive position. Autolite's OE status was continued and its share of the aftermarket was increased from 12.5% to 19%. Thus, its trademark is at least as strong now as when Ford acquired the company. Nor

did the acquisition and holding of Autolite injure its distribution system. The District Court found that Autolite did not own a distribution system. It merely had short-term contracts with jobbers who distributed its plugs to those who install them in cars or sell them to the public. Almost all of these jobbers had concurrent distribution relations with Ford. In fact, between 1961 and 1966 Ford *tripled* the number of jobbers handling Autolite plugs. From the opinion below, it appears that Ford has done nothing that will prevent an independent Autolite from seeking to maintain these distribution channels. The only possible finding of injury to be squeezed out of the acquisition relates to the fact that Autolite has been shorn of its status as OE supplier of Chrysler. But this is inconclusive. Autolite had nothing more in its position as OE supplier to Chrysler than it would if Ford voluntarily chose to use Autolite plugs after the divestment: a relationship based on short-term contracts the auto manufacturer could refuse to renew at any time.

The findings of the District Court indicate that Autolite's precarious position did not result from its acquisition by Ford. Prior to the acquisition both Champion and Autolite were in a continually precarious position in that their continued large share of the market was totally dependent on their positions as OE suppliers to auto manufacturers. The very factor that assured that they faced no serious competition in the short run also assured that in the long run their own position was dependent on their relationship with a large auto manufacturer. Thus, the threat to Autolite posed by a simple divestiture is the same threat it had lived with between 1941 and 1961 as an independent entity: it might be left without any OE supply relationship with a major auto manufacturer, and therefore its market position based on this relationship might decline drastically.

Today's opinion errs when it states, *ante*, at 571, that the District Judge found the OE tie the "key to the solution" of this problem. Although the court indeed found this tie a pervasive factor in the market, it also found that the phenomenon was not created by Ford and that it did not constitute a § 7 violation. Therefore the Court errs in justifying the ancillary remedies as necessary to overcome the OE tie. Even if such a remedy might overcome the OE tie, which I question, there is no justification for burdening *Ford* with the restrictive order.

Further, the only conclusion to be drawn from the trial findings is that the remedy is unlikely to result in a secure market position for Autolite at the end of the restricted period. Once again it will be dependent for its survival on whether it can maintain an OE supply status. The District Court's suggestion that Autolite can find a niche supplying private-brand labels is unpersuasive. It cannot be predicted with any certainty that these sales outlets will grow to the extent predicted by one person in that line of the business. Further, even if they do, this is no assurance of Autolite's survival. There are already several companies in the business of producing plugs for private labels. Autolite will have to compete with them. The results will not be helpful. One possibility is that Autolite would completely monopolize the private-brand market to the extent of about 17% of the replacement market. This is as uncompetitive as it is unlikely. The more reasonable likelihood is that Autolite might be able to gain a position producing, for instance, 5% of the replacement market plugs. But this would be useless because the District Court's findings make clear that Autolite's fixed-production plant cannot supply such a small share of the market at a profit.

In the final analysis it appears to me that the District Court, seeing the immediate precariousness of Autolite's

position as a divested entity, designed remedies to support Autolite without contemplating whether it was equitable to restrict Ford's freedom of action for these purposes or whether there was any real chance of Autolite's eventual survival. I fear that this is a situation where the form of preserving competition has taken precedence over an understanding of the realities of the particular market. Therefore I dissent from today's affirmance of the District Court's harshly restrictive remedial provisions.[5]

MR. JUSTICE BLACKMUN, concurring in part and dissenting in part.

I concur in Part I of the Court's opinion and in that portion of Part II that approves divestiture as part of the remedy. I cannot agree, however, that prohibiting Ford from using its own name or its trade name on any spark plugs for five years and enjoining it entirely from manufacturing plugs for 10 years is just, equitable, or necessary. Instead, the stringency of those remedial provisions strikes me as confiscatory and punitive. The Court's opinion, *ante,* at 566, recognizes that Ford could develop its own spark plug division internally and place itself in the same position General Motors has occupied for so long, but that this would take from five to eight years. The restraint on Ford's entering the spark plug area is thus for a period longer than it would take Ford to achieve a position in the market through internal development. And to deny it the use of its own name is to deny it a property right that has little to do with this litigation.

---

[5] This case illustrates the unsoundness of the direct appeal permitted in cases of this kind under 15 U. S. C. § 29. In a factually complicated case like this, we would be immeasurably aided by the screening process provided by a Court of Appeals review. Limited expediting of such cases, under the discretion of this Court, would satisfy all needs justifying direct review in this Court.