**UNITED STATES of America,**
**Appellant,**

v.

**ITT CONTINENTAL BAKING COM-**
**PANY, Appellee.**

Nos. 72–1072, 72–1073.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted May 22, 1973.

Decided Sept. 24, 1973.

See also, 10 Cir. 462 F.2d 1104.

George Edelstein, Atty., Dept. of Justice (Thomas E. Kauper, Asst. Atty. Gen., Howard E. Shapiro, Atty., Dept. of Justice, of Counsel, Joseph J. Gercke and James E. Corkey, Attys., Federal Trade Commission, with him on the Brief), for appellant.

John H. Schafer, of Covington & Burling, Washington, D.C. (Robert F. Welborn, of Welborn, Dufford, Cook, Phipps & Brown, Denver, Colo., and Gerald P. Norton, Washington, D.C., of counsel, with him on the brief), for appellee.

Before SETH, Circuit Judge, LARAMORE, Senior Judge, United States Court of Claims*, and DOYLE, Circuit Judge.

* Sitting by Designation.

SETH, Circuit Judge.

This is an appeal from the judgment of the District Court for the District of Colorado in a suit brought by the United States under the Clayton Act [15 U.S.C. § 21(*l*)], and the Federal Trade Commission Act [15 U.S.C. § 45(*l*)] against ITT Continental Baking Company. The Government sued to recover civil penalties and for injunctive relief for three asserted violations of a Federal Trade Commission consent cease and desist order relating to the acquisition of bakeries.

The case was tried on a stipulation of facts. The court ruled that two of the three challenged acquisitions were prohibited by the FTC's order, and the third was not. The court ruled also that each prohibited acquisition was a single violation of the order and did not commence a continuing violation. The maximum single penalty of $5,000.00 for each of the two violations was imposed. The court further held that the FTC's order, which had initially been applied to Continental Baking Company was also applicable to ITT Continental Baking Company and that ITT Continental was liable for the penalties. The court did not order ITT Continental to divest itself of the assets acquired in violation of the order, but did order ITT Continental to comply with the terms of the FTC order until that order expired.

The Government appeals from the court's judgment insofar as it held that the third transaction was not an "acquisition" in violation of the FTC order, that each violation was not a continuing one subject to penalties for daily violation, and insofar as the court did not order ITT Continental to divest itself of the three acquisitions. ITT Continental cross-appeals from the judgment, in its entirety, of the district court.

In May 1960, the FTC issued a complaint against Continental Baking Company, charging that Continental's acquisition of several baking companies engaged in the production and sale of bread from 1952 through 1958 violated section 7 of the Clayton Act [15 U.S.C. § 18], and section 5 of the Federal Trade Commission Act [15 U.S.C. § 45]. While the administrative proceedings were still in the hearing stage on this complaint, the parties negotiated a consent cease and desist order. The relevant part of the order provided:

"IT IS FURTHER ORDERED that for a period of ten (10) years from the date of issuance of this order by the Federal Trade Commission respondent shall cease and desist from acquiring, directly or indirectly, through subsidiaries or otherwise, the whole or any part of the stock, share capital, or assets of any concern, corporate or non-corporate, engaged in any state of the United States in the production and sale of bread and bread-type rolls unless the Commission, on petition for modification of this Section III of this order, permits such an acquisition by respondent, said modification to be within the sole and final discretion of the Federal Trade Commission."

This consent order is the basis for this action, and must be construed as to the nature of several transactions asserted by the Government to be in violation of its provisions, and as to the imposition of penalties if a violation has taken place. This should be done in accordance with the standards laid down in United States v. Armour & Co., 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256, and in Hughes v. United States, 342 U.S. 353, 72 S.Ct. 306, 96 L.Ed. 394. In the Armour case the Court said, after mentioning the negotiation and reasons for a consent decree:

"For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it. . . . the instrument must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation."

The consent order here concerned originated in a situation similar to a consent decree, and the reasons exist for application of the method of construction used in Armour. The order here is somewhat different in that it expressly permits or suggests reference to the complaint as an aid in construction. The result reached by the trial court in construing the order is not too restrictive nor unreasonable. It is one which may be arrived at by reference to the complaint, and by use of the method indicated in the Armour case. We will follow such a construction under these circumstances.

To consider the consent order "within its four corners," the wording is directed to the acquisition of businesses engaged in bread making, directly or indirectly. The only reference in the order is to the "acquiring" of such businesses. The complaint refers to the acquisition of bakeries as a course of conduct by Continental Bakeries. The order prohibits acquisition for a ten-year period. It is apparent from the record that it is upon the event of acquisition by the defendant that the local bakery is out of the bread making business. The acquisition itself, and not the *method* of operation thereafter, is the critical factor, and this is the event or incident to which the complaint and the order were directed.

This consideration of the order leads us to agree with the trial court as to whether the violations found were continuing or not, and also to agree as to the two particular acquisitions found by the trial court to be violations of the order.

As to the violations the record shows that in 1965 Continental and Bon Ton, Inc., of Missoula, Montana, entered into a sales agreement. Bon Ton, Inc. was engaged in the production of bakery products, including bread. These were sold at wholesale over thirteen routes in western Montana. Under the agreement, Bon Ton became an exclusive distributor of bread produced by Continental. Also, in the language of the parties' stipulation of fact, the " . . . understanding was that Bon Ton would cease production of bread . . . before it became a distributor of Continental's bread." On July 10, 1965, Bon Ton stopped producing bread and on the following Monday, began to distribute bread produced by Continental over the same routes and to the same customers as theretofore. On July 12, 1965, Bon Ton's president and owner of the vast majority of its stock deposited in the Bon Ton bakery account a Continental check drawn in his favor in the amount of $37,500.00. ITT Continental has described this amount as a "loan" to enable Bon Ton to meet Continental's credit requirements. However, Bon Ton gave to Continental an option to purchase the distributorship for the same amount. Continental acquired Bon Ton's accounts receivable, route books, customer lists, trademarks, trucks, and all but approximately $1,800.00 of its bank account. At this time, Bon Ton's "president" and its drivers became employees, on a salaried basis, of Continental. In consideration of the transfer Continental cancelled all outstanding invoices for products sold to Bon Ton and also cancelled the $37,500.00 "loan."

In April 1966 Continental and the Wyoming Baking Company entered into a "sales agreement," which was, in all relevant aspects, the same as the agreement entered into between Continental and Bon Ton. The same "understanding" existed as to Wyoming Baking's discontinuance of its own production of bread. In accordance with this "understanding," Wyoming Baking had ceased its own production of bread and began distributing Continental's products over the same routes and to the same customers. The sales agreement also provided that Continental would have an option to purchase the distributorship under certain circumstances. Some disagreement arose and the distributorship was sold, through the assistance of Continental, to another distributor from Idaho. This new ownership lasted about a year, at which time Continental itself acquired

the ownership for a cancellation of its debts and $15,000.00.

What is herein considered the third incident concerned the Sheppard Baking Company. This arrangement was not considered by the trial court to be a violation of the order while the above two were held to be in violation.

In August 1966 Continental and Sheppard Baking Company, of Durango, Colorado, entered into a "sales agreement" which was, in all relevant aspects, virtually identical to the agreements entered into between Continental, and Bon Ton and Wyoming Baking. Prior to this time Sheppard Baking had been engaged in the production and sale of bakery products, including bread and bread-type rolls, which were sold over routes in southwestern Colorado. As with Bon Ton and Wyoming Baking, the "understanding" between Continental and Sheppard Baking was that Sheppard would cease production of bread upon becoming a Continental distributor. In mid-October 1966, Sheppard stopped producing its own bread and began distributing that of Continental over the same routes, to the same customers, and in substantially the same quantities as it had formerly sold and distributed similar products produced at its own plant prior to that date. However, unlike the transactions concerning Bon Ton and Wyoming Baking, the sales agreement between Continental and Sheppard Baking did not involve any "loan," nor option agreement, nor an outright payment. The following specific covenant appears in the "sales agreement" between Continental and Sheppard Baking:

"Dealer covenants and agrees as follows:

. . . . . .

"To keep and maintain route books containing the name, address, and weekly purchases of each account in Dealer's territory. These route books shall be deemed an asset of the dealership and shall be transferred with the dealership in accordance with the provisions of this agreement."

The same provision, in exactly the same language, also appears in the sales agreements that Continental entered into with Bon Ton and Wyoming Baking, respectively.

■ Under these circumstances, we must hold that all three agreements accomplished the same purpose, which was to acquire indirectly such an interest or control in the business or the assets of the local baker so as to have him cease production. As to Sheppard Baking Company, there was no cash paid, and the dealership as such was not purchased, but the consideration for the exclusive arrangement was sufficient, and was effective to induce the owner to close the local bakery. This was an indirect acquisition prohibited by the order and a "payment" of money was not necessary to constitute a violation. The market and the volume was so acquired, and this was a principal asset of the bakery. There was a violation of the order in the arrangement with Sheppard Baking Company. See United States v. Columbia Pictures Corp., 189 F.Supp. 153 (S.D.N.Y.1960).

The trial court found that ITT Continental Baking Company ". . . is a successor of Continental Baking Company and that it assumed the liabilities of Continental Baking Company including the liabilities under the Federal Trade Commission consent order." ITT Continental concedes that it is liable for any violations of the FTC order that Continental incurred *prior* to the date of the merger between ITT and Continental, and the violations here concerned were such. Regal Knitwear Co. v. NLRB, 324 U.S. 9, 65 S.Ct. 478, 89 L.Ed. 661, is sufficient authority for this position under the facts before us.

As to the issue of a continuing violation for penalty purposes, the trial court found that the terms of the consent order "proscribe only the act of acquisition and that the violations of the consent order found as to Bon Ton and Wy-

oming Baking did not constitute a 'continuing failure or neglect to obey' said order. Accordingly the government's demand for imposition of daily penalties under 15 U.S.C. §§ 21($l$) and 45($l$) is denied. Once these two acquisitions were accomplished, the violations were complete."

Counsel for both parties have cited no cases directly in point, nor has our own independent research disclosed any such cases, dealing with what constitutes a "continuing failure or neglect to obey" a consent order of the type here in question for the purposes of imposing daily penalties for violation. 15 U.S.C. §§ 21($l$), 45($l$).

ITT Continental argues that the FTC order in this case does not proscribe the "holding of assets," but merely the acquisition thereof, and therefore there can be no continuing failure to obey the order by virtue of ITT Continental's holding of the dealership assets once they were initially acquired.

The Government, on the other hand, asserts that because a ban on acquisitions has been construed as a ban on the relationship such acquisitions create, see United States v. du Pont & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957); Gottesman v. General Motors Corp., 414 F.2d 956 (2d Cir.), the parties in this case intended to prohibit, by the consent order, the relationship created by such acquisitions in the same or similar manner that section 7 of the Clayton Act, 15 U.S.C. § 18, prohibits such relationship or effects. See United States v. du Pont & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957).

■ As we have recognized above, the scope of a consent decree must be discerned within its "four corners," United States v. Armour & Co., 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256, and must be construed "as it is written."

■ The "consequences" argument is significant as to penalties to be assessed for violation of the order; that is, whether the order was directed to the acquisition or to the acquisition and re-

tention of assets or interests. We have indicated above that we agree with the determination of this issue by the trial court. This was an interpretation of the consent order, and the result is in accordance with the prevailing standards. This court has determined that the three acquisitions were in violation of the order. The imposition of the penalties does not insulate the consequences of the acquisition from further proceedings which remain available to the Government. The defendant has taken the position that the order did not extend to the holding of assets acquired contrary to the order, or to the consequences thereof. The trial court so held and we have affirmed on this point. Thus the consequences of holding have been held to be outside the order, and outside the penalties, and outside of this action.

■ Divestiture as a remedy was advocated and advanced by the Government, but the trial court did not include it in its order. The extent of the penalties is within the discretion of the trial court. The trial court had jurisdiction to order divestiture or equitable remedies generally.

The case is remanded only for the imposition of a penalty by the trial court for the violation of the order in the Sheppard Baking Company acquisition as a single violation, in whatever amount the court sees fit within the statutory limits. Otherwise, the case is affirmed.

WILLIAM E. DOYLE, Circuit Judge, (concurring).

While I concur in the court's opinion, it is with reluctance that I approve of the remedy which has been imposed. Considering the frequency and magnitude of defendant-appellant's transgressions in this case, the mere imposition of a fine falls far short of a satisfactory outcome. Ordinarily a divestiture of the wrongfully acquired businesses would be the proper remedy, both to fulfill the objective of the antitrust laws, and to deter the defendant-appellant and other similarly-situated entities from commit-

ting such abuses in the future. Ford Motor Co. v. United States, 405 U.S. 562, 573, 92 S.Ct. 1142, 31 L.Ed.2d 492 (1972); United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964); United States v. E. I. Du Pont De Nemours & Co., 366 U.S. 316, 328–335, 81 S.Ct. 1243, 6·L.Ed. 2d 318 (1961); Schine Chain Theatres v. United States, 334 U.S. 110, 128, 68 S.Ct. 947, 92 L.Ed. 1245 (1948); United States v. Crescent Amusement Co., 323 U.S. 173, 189, 65 S.Ct. 254, 89 L.Ed. 160 (1944); United States v. Beatrice Foods Co., 351 F.Supp. 969 (D.Minn.1972). However, I have concluded that because of deficiencies in the consent decree and other factual characteristics of this case, the result reached, while weak, is within the range of remedies the trial court may impose. On this basis I agree with the result.