**LAZY D GRAZING ASSOCIATION, a Colorado Corporation, Appellant and Cross-Appellee,**

v.

**TERRY LAND AND LIVESTOCK COMPANY, a Wyoming Corporation, Appellee and Cross-Appellant.**

Nos. 79–1528, 79–1529.

United States Court of Appeals, Tenth Circuit.

Argued Nov. 19, 1980.

Decided Feb. 13, 1981.

Henry A. Burgess, Sheridan, Wyo. (Rodger I. Houtchens, Greeley, Colo., with him on brief), for appellant and cross-appellee.

Byron Hirst and Glenn Parker, Cheyenne, Wyo., for appellee and cross-appellant.

Before McWILLIAMS and SEYMOUR, Circuit Judges, and CHRISTENSEN, Senior District Judge.[*]

CHRISTENSEN, District Judge.

Lazy D Grazing Association (hereinafter Lazy D) appeals and Terry Land and Livestock Company, Inc. (hereinafter Terry) cross-appeals from a district court judgment that declared the respective interests of the parties in the mineral estate underlying land conveyed by Terry to Lazy D. The validity of that judgment depends upon a proper interpretation of a mineral interest reservation in the context of the following circumstances.

The conveyance to Lazy D, executed in 1965 and consisting of 21,920 acres of land, was part of a larger transaction between Terry and five other grazing associations. The purpose of the conveyances was to provide summer grazing for livestock owned by individual members of the six grazing associations. Each grazing association participated in the negotiations for the sale, which resulted in six separate, but identical deeds. Each deed contained a clause reserving "all gas, casinghead gas, oil, and other minerals valuable as a source of petroleum in and under said lands...."[1]

This action was initially brought by Lazy D to determine the rights of the parties to coal under the reservation clause. However, during the course of the proceedings, Lazy D expanded its complaint to seek a declaration of the meaning of the reservation clause as to all minerals underlying the land and asked that it be named owner of all minerals except gas, casinghead gas, oil and other minerals valuable as a source of petroleum. After the trial Terry amended its answer and counterclaim to conform to its view of the evidence, asking that it be declared the owner of all minerals except surface sand and gravel.

In a pretrial proceeding, the trial judge ruled that the reservation clause was ambiguous, a ruling to which neither party objected. Both parties presented extrinsic evidence bearing on the actual intent behind the reservation language. After considering the evidence, the trial judge entered judgment, declaring that Terry was the owner of all gas, casinghead gas, oil and other minerals—including coal and oil shale—which were valuable as a source of petroleum in 1965 or which had a prospective value as a source of petroleum on that date. Lazy D was declared the owner of all other minerals.

Undergirding this holding are a number of findings of fact and conclusions of law, which one or the other of the parties disputes on this appeal. The trial judge clarified his earlier ruling that the reservation clause was ambiguous by concluding that as to minerals valuable as a source of petroleum the reservation clause was ambiguous, but as to other minerals not valuable as a source of petroleum the clause was not ambiguous; the latter class of minerals was clearly not reserved by the reservation

---

[*] Of the United States District Court for the District of Utah sitting by designation.

[1.] The reservation clause reads in its entirety: EXCEPTING and RESERVING therefrom however, unto TERRY LAND AND LIVESTOCK COMPANY, INC., party of the first part, its successors and assigns, all gas, casinghead gas, oil, and other minerals valuable as a source of petroleum in and under said lands and appurtenances thereto, together with the right of ingress and egress at all times for the purpose of mining, drilling, exploring, operating and developing said lands for gas, casinghead gas, oil and other minerals valuable as a source of petroleum in and under said lands, and storing, handling, transporting and marketing same therefrom with the right to remove all property and improvements placed thereon by party of the first part, its successors and assigns.

clause and passed to Lazy D under the deed. He found that the parties intended to reserve to the seller all minerals having present or prospective value as a source of petroleum. He further found that oil shale and coal were prospectively valuable as sources of petroleum on the date of the deeds and were intended to be reserved.

### Lazy D's Appeal

Lazy D contends that the trial court erred in concluding that coal was reserved by the reservation clause.[2] It argues that it was error to rule that the reservation clause was ambiguous as to coal and contends that the court should have held that the clause, as a matter of law, did not reserve coal.[3] It asserts that the coal underlying its land can be removed only by strip mining, a method of extraction that would destroy the value of the surface for the grazing and agricultural purposes for which the land was purchased.

A number of courts have ruled that a broad grant or reservation of mineral interests does not include a mineral which is not specified in the grant or reservation when the only means of extracting the mineral would destroy the surface.[4] E. g., Cumberland Mineral Co. v. United States, 513 F.2d 1399 (Ct.Cl.1975); Wulf v. Shultz, 211 Kan. 724, 508 P.2d 896 (1973); Acker v. Guinn, 464 S.W.2d 348 (Tex.1971); Farrell v. Sayre, 129 Colo. 368, 270 P.2d 190 (1954); and Carson v. Missouri Pacific Railroad, 212 Ark. 963, 209 S.W.2d 97 (1948). Contra, Christman v. Emineth, 212 N.W.2d 543 (N.D.1973). If such a reservation were interpreted to include minerals that could be extracted only by destroying the surface, the reservation might engulf the grant leaving the surface estate owner with an empty property right. See Carson v. Missouri Pacific Railroad, 212 Ark. 963, 209 S.W.2d 97, 99 (Ark.1948). It has been reasoned that if the parties had intended such a result, they would have explicitly said so by specifying the mineral in the reservation clause.[5]

Lazy D contends that the trial court should have applied this reasoning and concluded that coal was not reserved under the reservation clause without considering extrinsic evidence of the parties' intent.[6] A

---

2. In the trial court Lazy D asked for a declaration as to the ownership of all minerals underlying the land; however, it has restricted its appeal to the trial court's determination that coal was reserved to Terry.

3. Lazy D makes this contention for the first time in this appeal. It did not object below to the trial court's ruling that the clause was ambiguous as to the reservation of coal nor to the introduction of extrinsic evidence. Because we agree with the trial court's ultimate holding, we are not constrained to insist upon any technical preclusion of Lazy D's argument here. But see Stephens Industries, Inc. v. Haskins and Sells, 438 F.2d 357 (10th Cir. 1971). Cf. Bulis v. Wells, 565 P.2d 487 (Wyo.1977).

4. The Wyoming court apparently has not addressed this question.

5. See Rocky Mountain Mineral Law Foundation, American Law of Mining § 15.16, at 167 (1979).

Professor Kuntz in a well-reasoned article argues that the rule is an arbitrary one, resulting in a bonus for the surface owner. He suggests that the better approach is to determine what minerals the parties intended to reserve without the aid of an artificial presumption, and then determine whether the parties intended to allow strip mining. Under this approach the possible destruction of the surface would be relevant to a determination of whether the parties intended to allow strip mining. The latter approach has the advantage of protecting against an unintended destruction of the surface estate, without awarding the surface owner the equally unintended bonus of mineral ownership. Kuntz, Law Relating to Oil and Gas in Wyoming, 3 Wyo.L.J. 107, 116 (1948). For a discussion of another criticism of the rule dealing with title examination problems, see Prendergast, The Texas Enigma— When is a Mineral Not a Mineral?, 23 Rocky Mtn.Min.L.Inst. 865 (1977).

6. Initially, we note that while some courts apply this rule as a matter of law, others view it as a means to determine the parties' intent. Under the latter approach the fact that the mineral will be removed by open pit or strip mining is only one factor in determining whether the parties intended to include a mineral in the reservation. See e. g., Southern Title Co. v. Oller, 595 S.W.2d 681 (Ark.1980). Contra, Reed v. Wylie, 554 S.W.2d 169 (Tex.1977). Since Lazy D has not established a factual basis for applying either standard, we here need not choose between the two approaches.

difficulty with this contention is that Lazy D failed to present evidence that the coal must be removed by a method that would destroy the surface. Two witnesses suggested that there were outcroppings of coal on the land, but neither specified how extensive these outcroppings were. Other witnesses testified that there were deep veins of coal under the land and that previous coal mining on the land had been undertaken by an underground method. There was no evidence of what percentage of the surface would be affected if strip mining were required to remove the surface coal. Such a record does not invoke a doctrine designed to protect against an uncontemplated "utter destruction" of the surface owner's estate. *Holloway Gravel Co. v. McKowen*, 200 La. 917, 9 So.2d 228 (1942). Here there is no showing that substantial destruction of the surface will result from strip mining operations.[7]

Properly rejecting Lazy D's contention regarding strip mining, the trial court went on to conclude that the reservation clause was ambiguous. In assessing whether this conclusion was correct, we may look to the Wyoming Supreme Court's definition of an ambiguous contract: An "ambiguous contract is one capable of being understood in more ways than one. It is an agreement which is obscure in its meaning, because of indefiniteness of expression, or because a double meaning is present." *Bulis v. Wells*, 565 P.2d 487, 490 (Wyo.1977). Here, the focus is on the ambiguity of the word "valuable." Lazy D argues that the term has the meaning attributed to it under the Federal Mineral Land Statutes[8]—that of present marketability, *i. e.*, can the coal presently be extracted from the ground, converted into petroleum and marketed at a price competitive with petroleum from other sources. On the other hand, Terry contends that the term is not limited to present marketability, but rather includes minerals that will in the future become marketable as a source of petroleum. Given this dispute as to the meaning of the word, the trial court properly determined that the clause was ambiguous.[9]

Lazy D next contends that the trial court erred in finding that the parties intended to reserve coal. It disputes two particular findings: 1) that the parties intended to reserve minerals having *prospective* value as a source of petroleum and 2) that the testimony of the witnesses established that the parties intended to reserve coal. Such findings of fact must be sustained unless they are not supported by substantial evidence. *Evensen v. Pubco Petroleum Corp.*, 274 F.2d 866 (10th Cir. 1960).

Expert witnesses for both parties testified that coal was not in 1965, nor is it now, presently valuable as a source of petroleum in the United States, since it is not competitive with other sources. But all agreed that, given the current oil shortage, it will become valuable as a source of petroleum in the future. The dispute is then whether the parties intended to reserve only minerals that are presently valuable as a source of petroleum or to include minerals that have prospective value as such a source.

7. In Texas it has been ruled that if a surface owner establishes that any of the disputed mineral lies at or near the surface, the surface owner retains title to all of the mineral. *Reed v. Wylie*, 554 S.W.2d 169 (Tex.1977). No Wyoming case suggests such a result, and we will accept the implication from the ruling of the experienced Wyoming trial judge that local law does not follow the Texas rule. *See, Sloan v. Peabody Coal Co.*, 547 F.2d 115 (10th Cir. 1977). Moreover, we note that any such rule would carry itself beyond its rationale. If only a small portion of the mineral lies at the surface, the removal process might not unreasonably interfere with the use of the surface. Whenever a mineral estate is severed from the surface, the surface owner must expect that even underground mining could affect his use of the surface to some degree. In the absence of evidence that removal of the surface minerals will result in an unreasonable destruction of the surface, it cannot be presumed under the circumstances of this case that the parties intended to leave the minerals with the surface estate so as to preserve the surface.

8. 30 U.S.C. §§ 22, *et seq.*

9. As will be discussed below, the definition of valuable under the federal statute is not conclusive of what the parties meant when they used the term.

Pointing to the "prudent man" and "present marketability" definition of "valuable" under the Federal Mineral Land Statute, Lazy D argues that the trial court erred in concluding that the parties intended to reserve minerals with only prospective value as a source of petroleum. The federal law permits citizens to locate "valuable" mineral deposits on federal land. 30 U.S.C. § 22. The courts have developed standards for determining whether a mineral deposit is valuable. The prudent man and marketability tests require a claimant to show that "a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine," and that, at the time of discovery, the mineral could be marketed at a profit. *U. S. v. Coleman*, 390 U.S. 599, 602, 88 S.Ct. 1327, 1330, 20 L.Ed.2d 170 (1968). Lazy D asserts that this meaning of "valuable" should be applied in the present case, reasoning that the long-standing definition of the term indicates that it is the most reasonable interpretation of the word and might well have influenced the parties when they were drafting the reservation.

In interpreting rights under the federal statute, the courts have developed the present marketability test to implement the intent of Congress. As the United States Supreme Court has explained,

Under the mining laws Congress has made public lands available to people for the purpose of mining valuable mineral deposits and not for other purposes. . . .

The marketability test . . . has the advantage of throwing light on a claimant's intention, a matter which is inextricably bound together with valuableness. For evidence that a mineral deposit is not of economic value and cannot in all likelihood be operated at a profit may well suggest that the claimant seeks the land for other purposes.

*U. S. v. Coleman*, 390 U.S. 599, 602–03, 88 S.Ct. 1327, 1330 (1968). The interpretation of "valuable" under these statutes casts little light upon what the private parties in this context intended when they used the term.[10]

There is no indication in the record that the parties or their attorneys gave thought to the interpretation of the word "valuable" under the federal statute. Michael Furbush, attorney for Terry and drafter of the reservation clause, testified that in drafting the clause he intended to include coal and "anything else you could squeeze a drop of oil out of."

Three other witnesses, each of whom participated in negotiating the terms of the sale, testified that the parties intended to reserve all minerals except surface sand

**10.** Furthermore, there have been exceptions to the present marketability rule on the issue of discovery under the federal statute, suggesting that the word can reasonably be construed to include minerals having prospective value. In *Andrus v. Shell Oil Co.*, 446 U.S. 657, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980), the Supreme Court was called upon to determine whether locations of oil shale made prior to the 1920 Mineral Leasing Act, which withdrew oil shale from discovery under the 1872 general mining law, were valid even though oil shale at that time had no present marketability. The Supreme Court ruled that the locations were valid, noting the long-standing administrative interpretation that had included oil shale within the Act even though there had never been a profitable market for it. The Court quoted from a 1927 Department of Interior decision, which indicated that oil shale, the value of which is tied to its capacity to be converted into petroleum, should be treated differently than other minerals:

> While at the present time there has been no considerable production of oil shales, due to the fact that abundant quantities of oil have been produced more cheaply from wells, there is no possible doubt of its value and of the fact that it constitutes an enormously valuable resource for future use by the American people.

48 U.S.L.W. at 4604 (quoting *Freeman v. Summers*, 52 L.D. 201 (1927)). In *Shell Oil* the court recited a long history of administrative interpretation indicating that when considering whether a mineral is valuable as a source of petroleum both its present and prospective value may be considered. Thus, the present marketability test is not the only reasonable interpretation of the word "valuable." This interpretation further suggests that when determining whether a mineral is valuable as a source of petroleum, prospective value should be considered.

and gravel. Significantly, two of these witnesses were representatives of grazing associations that purchased land in the same transaction and under deeds identical to Lazy D's. The only witness whose testimony rebutted this assertion was Robert Ruyle, the attorney representing the grazing associations in the negotiations. He testified that the parties did not intend to reserve coal and that early on in the negotiations the word coal was deleted from a preliminary draft of the deed at his objection. Furbush, the attorney for Terry, admitted that the original draft did contain the word coal and that Ruyle objected to that language. However, he denied that the substitution of the final version for the language containing specific reference to coal was made with the intent of deleting coal from the reservation. Rather, he testified that Terry's response to Ruyle's objection was that coal would be reserved. He explained that the substitution was an attempt to cover all minerals that might be sources of petroleum, rather than running the risk of omitting such a mineral in a list of specific minerals. The trial judge found that Ruyle's testimony was not credible, a judgment with which we cannot quarrel. Ruyle's testimony suggested that he had very little independent recollection of the negotiations, and four other witnesses contradicted his testimony.

The trial court's findings on this phase of the case, involving as they did issues of fact, were not clearly erroneous and must be sustained.

*Terry's Cross Appeal*

■ Terry contends the trial court should have ruled that the reservation clause was ambiguous as to its inclusion of all minerals, not just as to minerals valuable as a source

of petroleum.[11] Terry further argues that the court should then have given determinative weight to the testimony that the parties intended to reserve all minerals except sand and gravel. We believe the trial court correctly ruled that in this respect the reservation clause was not ambiguous and that by its express terms it did not reserve all minerals except sand and gravel.[12]

Terry attacks the lower court's assumption that only minerals that can be converted into petroleum are sources of petroleum. It reasons that a mineral can be a "source" of petroleum in two ways: 1) It can be converted into petroleum and 2) it can be a depository for petroleum in the ground. It argues that this double meaning renders the entire clause ambiguous.

Terry thus asks for an interpretation of the language "source of petroleum," without consideration of the context in which the language was used. Here our task is not to determine what the phrase means in the abstract, but rather what these parties intended the phrase to mean to the extent this may be seen from an examination of the writing and the context in which it was used. To do this, we must examine the language of the entire reservation clause, the nature of the subject matter and the circumstances of the parties. *See Bulis v. Wells*, 565 P.2d 487, 490 (Wyo.1977), and *Dawson v. Meike*, 508 P.2d 15 (Wyo.1973).

■ The parties' enumeration of the specific minerals, "gas, casinghead gas, [and] oil," qualifies the more general language, "and other minerals valuable as a source of petroleum." Under the *ejusdem generis* rule of construction, general terms in a reservation clause are construed to include only minerals that are similar in

11. The view of the trial court that a reservation clause may be ambiguous as to whether one class of minerals is reserved but unambiguous as to the reservation of other minerals finds support in Wyoming law. In *Dawson v. Meike*, 508 P.2d 15 (Wyo.1973), the Wyoming Supreme Court ruled as a matter of law that a clause reserving a one-half undivided interest "of all of the oil, gas and kindred minerals" did not reserve uranium, but that it could not be

determined as a matter of law whether the clause reserved coal.

12. While evidence of a party's intent is admissible to ascertain the meaning of an ambiguous contract, it may not be used to alter plain and unequivocal language, which must be applied as a matter of law. *See Bowen v. Korell*, 587 P.2d 653, 656 (Wyo.1978) and *Bulis v. Wells*, 565 P.2d 487 (Wyo.1977).

nature to minerals that are specified. *Sloan v. Peabody Coal Co.*, 547 F.2d 115 (10th Cir. 1977). Underlying this rule is the commonsense rationale that the parties, by enumerating specific minerals, have indicated they are primarily interested in reserving minerals that are similar in character to those specified. Here the enumeration of petroleum-like minerals indicates the parties intended to include within the more general language, "and other minerals valuable as a source of petroleum," only minerals that are similar in character to petroleum or that may be converted into petroleum. Thus we reject Terry's contention that the phrase "source of petroleum" necessarily includes all minerals serving as depositories for petroleum, since such minerals may or may not be similar in nature to petroleum.

The interpretation urged by Terry encounters other difficulties when examined in light of the nature of the subject matter and the circumstances of the parties. Testimony elicited at trial suggests that when the parties entered into the mineral reservation they were uncertain of the geologic and mineral formations underlying the land. Under Terry's interpretation the parties could not know what kinds of minerals were reserved until extensive geologic exploration was completed. It would be an unlikely situation for them intentionally to bargain for a reservation the scope and application of which could be determined only by an unknown geologic formation of the land.

We agree with the trial court's implicit determination that the language, "other minerals valuable as a source of petroleum" is limited in application under the circumstances of this case to minerals that can be converted into petroleum, and with its decision that the clause excluded from the reservation minerals that are not valuable as a source of petroleum.

AFFIRMED.