703 F.2d 1197
 12 Fed. R. Evid. Serv. 1220
 Margaret BAUM, Sid Marco, et al., William G. Johnson, et
al., Jack Ish, et al., Theodore Keller, et al.,
Glenn Nelles, et al., Joseph J. Jowers,
et al., Charlotte Smith,
Plaintiffs-Appellants,
v.
GREAT WESTERN CITIES, INC., OF NEW MEXICO, a New Mexico
corporation; California City Development Company, a
California corporation; Great Western United Properties,
Inc., a California corporation; and Great Western United
Corporation, a Delaware corporation, Defendants-Appellees.
 Nos. 80-1767, 80-1768, 80-1769, 80-1770, 80-1771, 80-1772,
80-1773 and 80-1774.
 United States Court of Appeals,
Tenth Circuit.
 March 9, 1983.
 
 Harold Breen, Taos, N.M., for plaintiffs-appellants.
 Allen M. Katz, Los Angeles, Cal. (Ronald L. Olson, Los Angeles, Cal., with him on briefs), of Munger, Tolles & Rickershauser, Los Angeles, Cal. (Marianne Woodard of Sutin, Thayer & Browne, Albuquerque, N.M., also on briefs), for defendants-appellees.
 Before BARRETT, McKAY and SEYMOUR, Circuit Judges.
 BARRETT, Circuit Judge.
 
 
 1
 These consolidated appeals arise from adverse jury verdicts rendered against the seven (7) plaintiffs below, following a three week trial of their actions, consolidated for trial with some 61 other plaintiffs, commenced on or about February 1, 1978. The appeals are taken from the judgments and the district court's denial of plaintiffs' post-trial motions for relief therefrom.
 
 
 2
 The genesis of plaintiffs'/appellants' (purchasers') complaints is that common law fraud and securities fraud under the Securities Exchange Act of 1934 and rule 10b-5 was practiced upon them by appellee, Great Western Cities, Inc., (Great Western) in the sale of unimproved lots in a real estate development located at Cochiti Lake, New Mexico. Purchasers sought rescission of their contracts and return of all purchase money, with interest, costs and attorney fees and punitive damages. Great Western's defense was that if any of the alleged misrepresentations were made by its sales representatives, they were made without the authorization, approval or knowledge of Great Western; furthermore, that the purchasers executed valid releases to Great Western, for valuable consideration, of any and all claims, including those alleged in the complaint. Thus, Great Western pled that the complaints were barred by principles of release, waiver, and accord and satisfaction. The jury found that the purchasers' claims for relief, with the exception of Baum, were barred by virtue of purchasers' execution of a General Release to Great Western, and that none of the purchasers had established right of recovery based on their common law fraud or securities law fraud claims. We agree. Some detailed recital of background is necessary.
 
 The Property
 
 3
 After the Army Corps of Engineers constructed a flood control dam which created a lake behind and on the Rio Grande River on land owned by the Pueblo de Cochiti, an Indian Tribe, in the 1960's, it was planned that the lake could be used by the public for boating, fishing and other recreational purposes. In 1969, the Cochiti Pueblo entered into a 99-year Master Lease with Great Western's predecessor for a 7,500 acre tract adjacent to the lake. The Master Lease, approved by the Bureau of Indian Affairs, provided that lessee would subdivide the project into residential lots to be offered to the public. The Master Lease required the lessee-developer, now Great Western, to make off-site improvements in the nature of paved streets, sewers, water system, electricity and gas equalling $2.25 million by 1974 and an additional $3 million by 1979. Further expenditure of $2 million was required by 1979 for the commercial area, swimming pool, tennis courts, marina, homes and apartments. The Master Lease did recognize that the plan envisioned converting undeveloped land to a developed community and, because it contemplated a number of years, the parties agreed that the aforesaid improvements need not be constructed ahead of actual need. The improvements were to be funded by an interest-bearing trust fund to which the lot purchasers would contribute. The lot sales commenced in 1970, five years before the dam and lake were completed. Each lot purchaser executed a "sublease agreement" in two documents, each of which, by reference, incorporated the Master Lease. The sublease agreement contained an integration clause reciting that the written agreement contained the entire agreement and that no oral representation could change the terms thereof. Neither the Master Lease nor the sublease agreement contained any promised dates by which the roads, water, utilities, etc., would reach the lots, nor were there any promised dates for improvements such as the golf courses, shopping center, gymnasium, etc.
 
 
 4
 Purchasers acquired their lots between 1970 and 1974. They were provided with property reports each year. Those reports did not promise specific dates for any improvements, but they did state that the improvements would be provided as the need exists.
 
 The FTC Settlement
 
 5
 Prior to the filing of the instant complaints and the consolidated trial thereon, the Federal Trade Commission (FTC) charged that Great Western, and other associates, had violated the Federal Trade Commission Act by misrepresenting certain matters in the sales or sublease of lands or lots, including those involved in the Cochiti Lake development. The FTC issued an original cease and desist order on October 20, 1972, pursuant to 15 U.S.C.A. Sec. 45(b) ordering Great Western to cease and desist from certain practices in the advertising and/or offering for sale of real estate in Cochiti Lake, New Mexico, and elsewhere. The FTC charges included allegations that Great Western, among other things, misrepresented to purchasers: that the land was a good investment because it was certain to increase in value; the nature and intent of the developments; its policy concerning the resale of the land purchased; and the amount of water available. Further, the FTC charged that Great Western failed to make certain required affirmative disclosures in its advertising.
 
 
 6
 Following detailed FTC compliance investigations, the FTC determined that rather than seeking exclusive civil penalties of Great Western and others, it would seek penalties and consumer redress relief remedies authorized pursuant to 1975 amendments to the Federal Trade Commission Act, codified at 15 U.S.C.A. at Secs. 45(a)(1), 56(a)(1) and 57(b) (Supp.1982)[1] and attendant affirmative action relative thereto. A negotiated settlement between FTC and Great Western, et al., resulted in a Consent Judgment entered January 27, 1977, in the United States District Court for the Central District of California. The Consent Judgment imposed a civil penalty of $50,000 on Great Western and it further required Great Western to make specified pro-rata payments to its purchasers at three projects, including Cochiti Lake, and to expend specified capital improvements at the projects. The Consent Judgment entered by the California court specifically provided that all purchasers who accepted the pro-rata payments would, in accord with the General Release attached thereto, waive any and all claims against Great Western. The Consent Judgment also provided that Great Western offer each of its lot purchasers the right to arbitrate claims of fraud or misrepresentation at Great Western's expense should any of them determine not to accept the pro-rata payment and execute a general release.
 
 
 7
 In accord with the Consent Judgment, Great Western mailed a cover letter, accompanied by a refund check and a General Release to each purchaser. The refund checks and General Release were accepted/endorsed and executed by each of the appellants. The cover letter advised that the enclosures should be read carefully. The back portion of the refund check stated that, by endorsement, the recipient would release all claims against Great Western. Furthermore, in bold print, this warning was written: "Important--This is a Release--Read it." The General Release advised each purchaser that acceptance of the check would constitute a release and, again in bold type, stated: "If you do not want to be bound by the terms of this General Release, do not endorse or cash the payment check you have received."
 
 Purchasers' Actions
 
 8
 The complaints filed by purchasers alleged that untrue statements of material fact were made by Great Western when they purchased the lots at the Cochiti Lake development, including assurance of an abundance of water, installation of sewer lines, paved streets, and acquisition of water rights to meet all water needs. In addition, omissions of material facts were alleged, including failure to assure sufficient funds to construct recreational facilities, water rights, paved streets, water lines or sewer facilities. Specific representations which purchasers alleged to be untrue included representations that: the purchase of the subleasehold lots would be an investment which would increase in value; Great Western would build four major recreation areas in the development by 1976, together with miles of riding trails, a golf center with both a nine hole (2,250 yard) and 18-hole golf course, a putting green, pro shop, golf pro, etc., an arts and crafts building, a gymnasium with basketball court, workout rooms for gymnastics and boxing, indoor swimming pool, boxing, steam and sauna room, a 1,650 seat outdoor amphitheater, two major commercial centers, a major chain motel-hotel with shopping plaza and a major tackle and boating supply store at the marina. [R., Vol. V, pp. 2095-2098]. Based upon the above and other alleged representations made by Great Western, purchasers contended that Great Western held out that there existed a large resale market for the subleasehold interests and that Great Western would establish a resale department to assist the Cochiti Lake purchasers in the resale of their investments prior to completion of the project. It should be here noted that these averments "dovetail" with the charges brought by the FTC in the California proceeding. [R., Vol. V, p. 2099]. These averments were denied by Great Western and, as previously observed, Great Western set up the affirmative defense of release, payment, waiver, and accord and satisfaction. [R., Vol. V, p. 114].
 
 
 9
 Prior to trial Great Western filed two motions for summary judgment. The first motion requested partial summary judgment dismissing certain claims advanced by the purchasers on the ground that they were barred by limitations. This motion was granted by the district court insofar as the plaintiffs-purchasers had advanced claims "under sections 12(1), 12(2) and 15 of the Securities Act of 1933, claims under section 1709 of the Interstate Land Sales Full Disclosure Act, and claims under section 58-13-42, N.M.Stat.Ann. (1978) of the New Mexico Blue Sky Law." [R., Vol. III, pp. 1096-1108]. This ruling, then, left only the common law fraud claims and claims under the Securities and Exchange Act of 1934 viable.
 
 
 10
 Thereafter, Great Western moved for summary judgment for dismissal of the remaining claims advanced by purchasers on the ground that there was no genuine issue as to any material fact, predicated on the General Release executed by each of the plaintiffs-purchasers in favor of Great Western. [R., Vol. II, p. 905]. Great Western contended that inasmuch as each of the plaintiffs-purchasers had accepted the specified pro-rata payment, and endorsed the check with its attendant release of claims language and had executed the General Release, that this extinguished any and all claims held by these plaintiffs-purchasers against Great Western. It was specially observed that each of the documents submitted by Great Western, including its cover letter, were attached to and made a part of the "Consent Judgment" approved by Great Western, the FTC, the United States Attorney in Los Angeles, the Consumer Affairs Section of the Antitrust Division of the Department of Justice and, of course, the United States District Court for the Central District of California.
 
 
 11
 The district court denied Great Western's motion on the ground that California law required a showing apart from the words contained in the General Release of an intent on the part of the purchasers to release the claims remaining for trial in this action. Purchasers had argued to the court that although they did endorse the pro-rata checks submitted by Great Western and did execute the General Release that, even so, they are not foreclosed from advancing these claims against Great Western because at the time of endorsement-execution aforesaid, they did not know that they had any claims against Great Western. Accordingly, argued purchasers, they could not have intended to release claims they did not know about. The trial court interpreted California law in a manner supportive of purchasers' contention and found that the validity of the General Release must be determined on the facts by the jury, i.e., whether an individual purchaser knew or suspected that he or she had a claim against Great Western at the time the release was executed. The district court thus denied the motion for summary judgment on the question of release and waiver. [R., Vol. IV, p. 1609].
 
 
 12
 At trial the purchasers testified in detail that a particular salesperson of Great Western orally promised that certain of the aforesaid improvements would be provided in a few years. This evidence was contradicted in material part. Great Western presented evidence relating to the technical aspects of such major developments. Basically, such a project commences with construction of a "core area" of developed lots retained by the developer; adjacent unimproved lots are thereafter sold to make for the full community. If the area has not been developed to the location of a sold unimproved lot, the owner of that lot who desires to reside in a home on the project is provided the right to trade the unimproved lot for an improved lot in the "core area". At the time of trial, there were some 400 improved lots in the "core area" available for any purchaser who wished to build in that area. The evidence established that the Cochiti Lake development had not grown as hoped or anticipated in terms of residential construction because of factors beyond the control of Great Western, particularly the tight market for mortgage financing and the unwillingness of lending institutions to lend funds for vacation homes in an unproven community. There were other unexpected impediments, including the fact that many of the lot purchasers determined not to build homes and move to the community. Rather, they sought to resell their lots for a profit.
 
 
 13
 The jury returned verdicts against each of the seven (7) plaintiffs-purchasers on the rule 10b-5 securities fraud claim and the common law fraud claim. Furthermore, the jury returned verdicts finding that all of the plaintiffs-purchasers, except Margaret Baum, had released their claims by virtue of execution of the General Release.
 
 
 14
 On appeal, plaintiffs-appellants contend that the trial court erred in: (1) refusing to instruct the jury on purchasers' breach of contract claim inasmuch as appellants established the existence of a contract between themselves and Great Western with exhaustive evidence; (2) refusing to give appellants' requested instruction that the 1977 compromise-settlements effected by Great Western pursuant to the "Consent Judgment" entered in the California proceeding initiated by the FTC were not to be considered inasmuch as they were utterly null and void because no bona fide dispute then existed between appellants and Great Western; (3) refusing to grant appellants' motion for an Order of Protection filed March 14, 1977, restraining Great Western from submitting any settlement-release instruments to appellants arising from the January 25, 1977, approval by the California Court of the FTC-Great Western settlement evidenced by the "Consent Judgment" on the ground that prior to 1975 (when the FTC was granted authority to redress injury to consumers) each of the contracts between appellants (purchasers) and Great Western had been entered into; accordingly, the only remedy available to FTC was the pre-1975 remedy of a civil monetary penalty against Great Western; (4) granting Great Western's motion to dismiss the class action; (5) denying appellants' motion for new trial in light of the jury's failure to find that the overwhelming weight of the evidence established that Great Western perpetrated fraud on the appellants as purchasers; (6) refusing to allow the testimony of appellants' sole rebuttal witness, Mr. Ned Judge, who would have testified with respect to Great Western's intent to defraud the purchasers; and (7) refusing to give appellants' requested instructions on constructive fraud and negligent misrepresentation.
 
 
 15
 Appellee, Great Western, contends that although the judgments should be affirmed, that the district court misapplied California law in denying Great Western's motion for summary judgment based on the written general releases executed by the plaintiffs-purchasers.
 
 I.
 
 16
 Purchasers contend that the trial court erred in refusing to instruct the jury on their breach of contract claim inasmuch as purchasers had established the existence of a contract between themselves and Great Western with exhaustive evidence.
 
 
 17
 The executed "contract" between Great Western and the purchasers was the Sublease Agreement. It is the purchasers' position that the contract between Great Western and purchasers consisted not only of the written, executed Sublease Agreement, but the many and varied oral promises made by Great Western's representatives both prior to and at the time of execution of the Sublease Agreement. It was Great Western's failure to perform the alleged oral promises which created the claimed breaches. Significantly, purchasers did not contend or prove any breach by Great Western of the Sublease Agreement proper, which incorporated, by reference, the Master Lease and the Cochiti Lake Improvement Trust Agreement.
 
 
 18
 The issue boils down to whether there exists any ambiguity in the Sublease Agreement which would require the trial court to disregard paragraph 22 of the Sublease Agreement which provides that the Sublease Agreement contains the entire agreement between Sublessee and Sublessor and that no representative of Great Western has any power to change, modify or make any terms or provisions other than those contained therein. Purchasers argue that in order to ascertain the meaning and legal effect of an agreement, the other acts and words of the parties to the transaction must be considered as a whole. [Brief of appellants, pp. 25-29]. Accordingly, purchasers contend that the Sublease Agreement is not an integrated contract and that parol evidence should have been admitted to ascertain the contract as a whole. We disagree.
 
 
 19
 The trial court ruled that this is not a breach of contract case, but rather a fraud lawsuit and that the jury would be so instructed. [R., Vol. XXI, p. 1631]. The court refused purchasers' requested instruction number 4 reading as follows:
 
 
 20
 With respect to the plaintiffs' claim for breach of contract, you are instructed that the contract consists of the sublease agreement special provisions; sublease agreement general provisions; the master lease; the Cochiti Lake improvement trust agreement; and any oral promises made by the parties prior to or at the time of execution or signing of the sublease agreement.
 
 
 21
 If you find that defendants failed to perform any of the promises made in writing or orally and that such promises were a material part of the contract, then you must find in favor of the plaintiff on this claim. [Emphasis supplied].
 
 
 22
 [R., Supp.Vol. II, p. 5].
 
 
 23
 We hold that the trial court did not err in refusing to submit the breach of contract claim to the jury. The record does not reflect that any portion of the written Sublease Agreement was ambiguous or breached. Thus, clearly the parol evidence would have altered, varied or contradicted the terms of the Sublease Agreement in violation of the parol evidence rule. See: Zobel v. Dale Bellamah Land Co., Inc., 78 N.M. 586, 435 P.2d 205 (1967); Maine v. Garvin, 76 N.M. 546, 417 P.2d 40 (1966); Halliburton Co. v. McPheron, 70 N.M. 403, 374 P.2d 286 (1962). While evidence of intent is admissible to ascertain the meaning of an ambiguous contract it cannot be used to alter plain and unambiguous language, which must be applied as a matter of law. Lazy D Grazing Ass'n. v. Terry Land, 641 F.2d 844 (10th Cir.1981).
 
 
 24
 The parol evidence rule is, of course, fundamentally a rule of substantive law, not the law of evidence. It declares that specific conduct of the parties is without legal effect with respect to their later conduct; the earlier conduct is inoperative to add to or vary the later writing. Thus, any evidence offered to prove earlier conduct is irrelevant if offered to contradict unambiguous writing. 3 Corbin on Contracts Secs. 573, 589 (1960 & Supp.1971). Evidence of surrounding circumstances and oral representations, pursuant to purchasers' theory, i.e., to establish the "entire" contract which Great Western allegedly "breached" is, in our view, patently inadmissible simply because it was not required to clear up any doubt or ambiguity about the true sense or meaning of words. The evidence was admissible only to establish that Great Western practiced fraud upon the purchasers to induce them to contract.
 
 
 25
 It is only when the trial court determines that a contract is ambiguous that extrinsic evidence is admissible to clarify the parties' intent. It then becomes a question of fact. Young v. Thomas, 93 N.M. 677, 604 P.2d 370 (1979). Thus, the trial court's initial determination cannot be overturned unless clearly erroneous. In Palmer v. Howard, 493 F.2d 830 (10th Cir.1974) we stated that extrinsic evidence involving actions and conduct of parties, together with expressions, such as that presented in the case at bar, is admissible for the purpose of ascertaining intent of the parties in adopting a clause. Such does not violate the parol evidence rule. And in Hicks v. Simmons, 271 F.2d 875 (10th Cir.1959) we observed that the parol evidence rule does not forbid two contemporaneous contracts, one written and one oral, with respect to the same subject matter, providing the two can be made to stand together without the oral contract affecting the integrity of the written one. Evidence of fraud in the inducement, on the other hand, is not to vary or contradict written terms of a contract, even though it does alter the legal effect and impact of the written agreement. In equity, proof of fraud in the inducement invokes the equitable doctrines of rescission and reformation. As noted, contracting parties have the power to reduce some portions of their total contract to writing and leave other portions to oral expressions only. However, under such circumstances, the oral expressions are legally significant only if they are not contradictory and have some effect upon the interpretation, application and legal operation of the written portion. 3 Corbin on Contracts Sec. 581 (1960 & Supp.1971).
 
 
 26
 In the case at bar, purchasers attempted to employ the alleged oral representations to add new terms to the Sublease Agreement, including specific deadlines (dates) for the installation of utilities, completion of recreational facilities, etc., in variance with the "as needed" provisions of the written contract. This evidence was fully presented and, to be sure, effectively argued to the jury as fraudulent representations inducing purchasers to enter into the contract with Great Western. Thus, the evidence was admitted not to resolve some ambiguity in the written Sublease Agreement, but rather to resolve the common law fraud and securities fraud claims. No error was committed by the trial court.
 
 
 27
 The Sublease Agreement and the Master Lease, incorporated by reference, contained no promised dates by which roads, water, utilities, golf courses, recreational facilities, etc., would be installed-constructed, except as when the need existed. The parol evidence was in variance with the terms of the Sublease Agreement, and the court did not err in refusing to instruct the jury pursuant to purchasers' requested instruction number 4.
 
 
 28
 In this case, it is unchallenged that the parties did agree in the Sublease Agreement, via an integration clause, that the written agreement contained the entire agreement and that no oral representation could change the terms thereof. Such a provision, we recognize, could be held void as against public policy, if invoked to bar parol evidence of oral representations made antecedent to or concurrent with the written contract aiding in the interpretation of ambiguous written language. 3 Corbin on Contracts Sec. 578 (1960 & Supp.1971). The provision does not suffer such infirmity in this case, however. There was no ambiguity in the Sublease Agreement.
 
 
 29
 In Resort Car Rental System, Inc. v. Chuck Ruwart Chevrolet, Inc., 519 F.2d 317 (10th Cir.1975) we said:
 
 
 30
 In reviewing the trial court's construction of the contract [here, that there was no breach of contract action], it should be noted that ordinarily the construction of a contract is a question of law for the court. Unless the words used by the parties to express their agreements are found to be ambiguous in some material respect, it is the province and duty of the court to give them legal effect according to their plain, ordinary and popular meaning. [Citations omitted].
 
 
 31
 * * *
 
 
 32
 * * *
 
 
 33
 This brings us to the question whether the securities laws imposed duties to disclose beyond those which we have found in the contract itself. The federal statute invoked by Resort, Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 thereunder, 17 C.F.R. Sec. 240.10b-5, provide, in pertinent part, that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading...." This and other courts have uniformly emphasized the need to interpret this rule flexibly so as to prevent fraud. [Citations omitted]. And there is no need to prove the elements of common law fraud, including positive proof of reliance; nor is there room for the doctrine of caveat emptor. [Citation omitted]. Nonetheless, to grant relief under 10b-5, we have consistently required that the defendant act with a degree of scienter or intent beyond mere negligence and that the plaintiff act in good faith and reasonably under the circumstances. [Citations omitted].
 
 
 34
 519 F.2d at pp. 320, 321.
 
 
 35
 In Raulie v. United States, 400 F.2d 487 (10th Cir.1968), we relied on the rule that unless a contrary intention appears in the instrument, the words used are presumed to have been used in their ordinary or customary meaning, deliberately without intention.
 
 
 36
 In the context of the agreement between the parties here involved, regarding the on-going development of the Cochiti Lake Development, the covenant of Great Western to provide water, sewer lines, utilities, etc., when needed is not ambiguous. That, then, left the allegations of purchasers relative to untrue representations and/or omissions to meet the measure of proof required to establish common law fraud and/or securities fraud.
 
 
 37
 We do not decide the statute of fraud defense advanced by Great Western as an additional ground for holding that the terms of the Sublease Agreement are the only written terms and that leases of more than three years come within the statute of frauds. The trial court did not reach this issue. We note, however, that there is merit in the contention. See 2 Corbin on Contracts Sec. 402 (1960 & Supp.1971).
 
 II.
 
 38
 Purchasers argue that the trial court erred by refusing to tender purchasers' requested instruction that the 1977 compromise-settlement effected by Great Western pursuant to the "Consent Judgment" entered in the California proceeding initiated by the FTC was not to be considered inasmuch as it was utterly null and void because no bona fide dispute then existed between purchasers and Great Western.
 
 
 39
 This contention is specious and without merit. The brief of appellants is not a prize example of artful presentation of reasons or basis for the contention. We do, however, believe that the predicate relied on by purchasers is that because the purchasers were not direct parties in the California proceeding, they had no dispute with Great Western:
 
 
 40
 When purchasers herein received the $300 or $400 cash payment checks in the mail from Great Western in 1977, purchasers had no dispute with Great Western. In the absence of a dispute or controversy between the parties to an alleged settlement, the settlement or compromise must fail.
 
 
 41
 * * *
 
 
 42
 * * *
 
 
 43
 None of the purchasers herein had filed their lawsuits against Great Western in 1977. None of the purchasers had initiated their lawsuits against Great Western until 1978. Purchasers had no disputes with Great Western in 1977 and clearly Great Western had no dispute with the purchasers when the promoters mailed the cash payment checks to the purchasers in 1977.
 
 
 44
 [Brief of appellants, pp. 11, 12].
 
 
 45
 The apparent instruction tendered by plaintiffs-purchasers which was not approved or submitted by the trial court read:
 
 
 46
 A party seeking to enforce the terms of a settlement, compromise or release must prove the existence of a prior, bona fide dispute between the parties concerning the subject matter of the alleged subsequent settlement, compromise or release. In the absence of a dispute between the parties, no settlement, compromise or release is valid between the parties.
 
 
 47
 [R., Vol. III, p. 1248].
 
 
 48
 We have previously referred to the cover letter from Great Western to purchasers, with enclosures, including the cash payment checks and General Release. These writings made it abundantly clear to all purchasers that Great Western had been charged by the FTC with misrepresentations and/or omissions of fact and that the settlement, approved per the "Consent Judgment", was tendered as full settlement of any claims then outstanding that any purchaser might have against Great Western.
 
 
 49
 Purchasers, in our view, play upon words in arguing, as they do, that there were no "disputes" between purchasers and Great Western in 1977 when the settlement-compromise letter, check and General Release were tendered by Great Western. Purchasers apparently contend that it was only when they filed lawsuits against Great Western that the "disputes" came into being. For some unexplained reason, purchasers decline to employ the word "claims" in lieu of "disputes". It seems perfectly obvious that one must "own" a "claim" in order to generate a "dispute".
 
 
 50
 The cover letter from Great Western, dated May 20, 1977, accompanied with enclosed check and General Release, specifically recites that "Endorsement of the check will result in your releasing the companies from claims as set forth in the General Release." [R., Vol. II, p. 932]. The special disbursement checks enclosed contained, above the endorsement space on the back thereof, an acknowledgment and acceptance constituted "release, waive[r] and for[ebearance of] all claims" against Great Western. [R., Vol. II, p. 934]. Finally, the General Release expressly referred to "[r]elease and discharge of [Great Western] ... of and from any and all claims and cause of action of every nature ... which recipient may have against [Great Western], arising out of or relating to the recipient's purchase or sublease of real estate interests in ... Cochiti Lake, New Mexico, by reason of any acts of things done or omitted prior to and including the date of this General Release, which date is January 25, 1977." [R., Vol. II, p. 935]. Further, the cover letter stated that Great Western did not thereby acknowledge any wrongdoing.
 
 III.
 
 51
 Purchasers contend that the trial court erred in refusing to grant their motion for an order of protection to restrain Great Western from submitting any settlement-release instruments to purchasers arising from the January 25, 1977, "Consent Judgment" entered by the California court arising out of the FTC-Great Western settlement-compromise.
 
 
 52
 The ground for the motion by purchasers was that prior to 1975 (when the Congress expressly authorized the FTC to redress injury to consumers) each of the contracts between purchasers and Great Western had been entered into; thus, the only remedy available to the FTC in the California proceeding was the pre-1975 remedy of a civil monetary penalty against Great Western.
 
 
 53
 The predicate for purchasers' motion was this: the "Consent Judgment" was entered in the California federal court on January 25, 1977; purchasers' motion for protective order was filed in this action on March 14, 1977, to prevent Great Western from communicating with purchasers, on the ground that all of the transactions between Great Western and purchasers complained of in this action occurred prior to the 1975 amendment to the Federal Trade Commission Act and, accordingly, the only remedy available to the FTC in this case was limited to issuance of cease and desist orders and civil penalties for violations of the Act. In this case, the FTC issued its cease and desist order on October 20, 1972, requiring Great Western to cease and desist from sales practices involving misrepresentation and omission of material facts. Purchasers thus contend that FTC was not authorized to negotiate restitution of monies to those subjected to unfair and deceptive business practices. We agree that purchasers' contention is correct. However, it is not controlling inasmuch as the "Consent Judgment" with its commanded remedies was that of the United States District Court for the Central District of California and not that of the FTC.
 
 
 54
 Purchasers rely primarily on Heater v. FTC, 503 F.2d 321 (9th Cir.1974). In that case the court held that the FTC, in its cease and desist order, was not empowered to order restitution to consumers. Significantly, that decision did not involve the power and authority of the district court. Rather the issue was the power of the FTC to order restitution to consumers.
 
 
 55
 Section 206(b) of the Federal Trade Commission Improvements Act provides that consumer redress may be sought under Section 19(a)(2), if the cease and desist order is entered after January 4, 1975. As heretofore noted, the cease and desist order issued by the FTC in this case was issued October 20, 1972, and became conclusive on January 12, 1973. Thus, the question for resolution is not whether the FTC was empowered to order consumer redress pursuant to its October 20, 1972, cease and desist order (it was not so empowered) but, rather, whether the United States District Court for the Central District of California was so empowered pursuant to its "Consent Judgment". We hold that it was so authorized and empowered.
 
 15 U.S.C.A. Sec. 45(l ) provides:
 
 56
 Any person, partnership, or corporation who violates an order of the Commission after it has become final [here January 12, 1973], and while such order is in effect, shall forfeit and pay to the United States a civil penalty of not more than $10,000 for each violation, which shall accrue to the United States and may be recovered in a civil action brought by the Attorney General of the United States. Each separate violation of such an order shall be a separate offense, except that in the case of a violation through continuing failure to obey or neglect to obey a final order of the Commission, each day of continuance of such failure or neglect shall be deemed a separate offense. In such actions, the United States district courts are empowered to grant mandatory injunctions and such other and further equitable relief as they deem appropriate in the enforcement of such final orders of the Commission. [Emphasis supplied].
 
 
 57
 We recognize that private litigants cannot invoke the jurisdiction of the district courts by alleging violations of business practices proscribed by 15 U.S.C.A. Sec. 45(a)(1). The remedial power rests exclusively in the FTC. Of significance here, however, is the fact that the FTC did not proceed pursuant to 15 U.S.C.A. Sec. 45(b). If it had, any order entered by the FTC would have been subject to review exclusively in the "[circuit] court of appeals of the United States, within any circuit where the method of competition or the act or practice in question was used ... or where [the party required by FTC to cease and desist] resides or carries on business, ...." 15 U.S.C.A. Sec. 45(c). Had the FTC proceeded pursuant to that statute, purchasers' challenge would have been viable.
 
 
 58
 In United States v. ITT Continental Baking Co., 485 F.2d 16 (10th Cir.1973), rev'd on other grounds, 420 U.S. 223, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975), we recognized that the scope of equitable remedies available to the district courts under 15 U.S.C.A. Sec. 45(l ) was within the discretion of the trial court. That case involved a government suit brought to recover civil penalties and injunctive relief for alleged violations of an FTC consent cease and desist order. We said:
 
 
 59
 Divestiture as a remedy was advocated and advanced by the Government, but the trial court did not include it in its order. The extent of the penalties is within the discretion of the trial court. The trial court had jurisdiction to order divestiture or equitable remedies generally. [Emphasis supplied].
 
 
 60
 485 F.2d at p. 21.
 
 
 61
 In like manner, the Court of Appeals in United States v. Reader's Digest Association, Inc., 662 F.2d 955 (3d Cir.1981), cert. denied, 455 U.S. 908, 102 S.Ct. 1253, 71 L.Ed.2d 446 (1982) upheld the district court's judgment enforcing a consent decree entered into between the FTC and Reader's Digest and the court's remedy, i.e., assessment of a civil penalty of $1,750,000, accompanied by a broad permanent injunction which the court construed to meet the protection intended by the consent order. The court observed:
 
 
 62
 There is ample evidence in the record to support the court's conclusion that the Digest cannot be reasonably expected to comply with the consent order in the future without a judicially imposed prohibition.
 
 
 63
 * * *
 
 
 64
 * * *
 
 
 65
 We find that the district court concluded correctly that each individual mailing constituted a separate violation of the consent order, and that the court did not abuse its discretion by assessing a penalty of $1,750,000 upon the Digest. Finally, we hold that the district court did not abuse its discretion by enjoining the Digest from future violations of the consent order.
 
 
 66
 662 F.2d at p. 970.
 
 
 67
 It is our view that the civil penalty provision of 15 U.S.C.A. Sec. 45(l ) is not the exclusive remedy for violation of a consent order available to the federal district courts. The Congress intended Sec. 45(l ) to provide compliance with the consent order for the protection of the public and the business community from deceptive advertising and unfair competition. To hold otherwise would, we believe, render the grant of authority under Sec. 45(l ), i.e., "and such other and further (beyond express power to grant mandatory injunctions and civil penalties) equitable relief as they deem appropriate in the enforcement of such final orders of the Commission" meaningless. When "such other and further equitable relief" is ordered the only issue, if such is challenged, is whether the district court abused its discretion. Such did not occur in the case at bar.
 
 IV.
 
 68
 Purchasers claim that the trial court erred in granting Great Western's motion to dismiss the class action. We hold that the district court did not err in ruling that the action not proceed as a class action.
 
 
 69
 The district court's extensive memorandum opinion, accompanying its order, both entered September 27, 1977 [R., Vol. II, pp. 629-673], sets forth the many factors to be considered in the court's determination whether, under rule 23(b)(3) the class action device is "superior" and whether questions of law or fact common to the members of the class "predominate" over any questions affecting only individual members. The trial court pertinently observed:
 
 
 70
 At this stage it cannot be determined with total clarity what will be the extent of individual issues to be decided if the suit should proceed as a class action. While it appears that the central question of what was represented to purchasers of subleasehold interests at Cochiti Lake may be the common issue that could well be determined in the context of a class action, it is not at all evident that that general common issue would predominate over the potentially vexing individual issues of reliance and the various statutes of limitations. Because there are substantial doubts as to whether plaintiffs will be able to satisfy the "predominance" requirement even after extensive discovery on the class action issue, the risk of unfair expense to both defendants and the named individual plaintiffs should it eventually be determined that the suit cannot proceed as a class action is another factor weighing against a finding that the class action is "superior" to the proposed arbitration program.
 
 
 71
 [R., Vol. II, pp. 634, 635].
 
 
 72
 We hold that the district court did not err in granting Great Western's motion to dismiss the alleged class action and to strike the class action allegations of the complaint. The certification of a class is within the discretionary powers of the trial court "and its determination will not be disturbed absent a showing of abuse of discretion." Rex v. Owens ex rel. State of Oklahoma, 585 F.2d 432 (10th Cir.1978); Peterson v. Oklahoma City Housing Authority, 545 F.2d 1270 (10th Cir.1976). No abuse of discretion occurred here.
 
 V.
 
 73
 Purchasers argue that the trial court erred in denying their motion for a new trial in light of the jury's failure to find that the overwhelming weight of the evidence established that Great Western perpetrated fraud on the purchasers. Our review of the record convinces us to the contrary. There is substantial evidence supporting the verdicts.
 
 
 74
 The key requirement legally invoked upon purchasers was proof of intent to defraud on the part of Great Western. In order to make such a case it was incumbent on purchasers to convince the jury that Great Western did not intend to perform. Questions of intent which involve intangible factors, including witness credibility, are matters for consideration of fact finder after a full trial. Prochaska v. Marcoux, 632 F.2d 848 (10th Cir.1980), cert. denied, 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 841 (1981); Buell Cabinet Co., Inc. v. Sudduth, 608 F.2d 431 (10th Cir.1979).
 
 
 75
 In Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980) (per curiam) the Supreme Court, speaking of the trial court's power to grant a new trial pursuant to Fed.R.Civ.P. 59, said, inter alia:
 
 
 76
 The authority to grant a new trial, moreover, is confided almost entirely to the exercise of discretion on the part of the trial court. Where a matter is committed to discretion, it cannot be said that a litigant's right to a particular result is "clear and indisputable." Will v. Calvert Fire Ins. Co., 437 U.S. 655, 666 [98 S.Ct. 2552, 2559, 57 L.Ed.2d 504] (1978) (plurality opinion).
 
 
 77
 449 U.S. at p. 36, 101 S.Ct. at 191. [Emphasis supplied]. Accord: Thompson v. Kerr-McGee Refining Corp., 660 F.2d 1380 (10th Cir.1981), cert. denied, 455 U.S. 1019, 102 S.Ct. 1716, 72 L.Ed.2d 137 (1982); Frank v. Bloom, 634 F.2d 1245 (10th Cir.1980); 11 Wright & Miller, Federal Practice and Procedure Secs. 2803, 2809 (1973).
 
 VI.
 
 78
 Purchasers contend that the trial court erred in refusing to allow the testimony of purchasers' sole rebuttal witness, Mr. Ned Judge, who would have testified with respect to Great Western's intent to defraud purchasers.
 
 
 79
 When Judge was called at the close of Great Western's case by purchasers as a rebuttal witness, Great Western objected. The trial court reserved ruling and heard arguments of counsel the following day. The record reflects that Mr. Judge had been in contact with counsel for purchasers in the course of their case-in-chief and counsel for purchasers decided to call him as part of their in-chief case. It was agreed, in view of the fact that Judge had not been previously listed or identified as a witness, that Great Western's counsel would have the opportunity to interview him prior to his testimony. Mr. Judge did not appear for the interview and purchasers' counsel informed Great Western's counsel that Mr. Judge had left town and, accordingly, he would not be called as one of purchasers' witnesses. All evidence was presented the day before oral argument. It was then that purchasers notified the court that they wished to call Mr. Judge as a rebuttal witness.
 
 
 80
 Purchasers' counsel submitted an offer of proof that Judge would testify: he worked on a film presentation concerning Cochiti Lake in 1970, during which time he visited Great Western's Denver office with an associate, Mr. Tapino; while there, Judge and Tapino went to dinner with a Mr. White, president of Great Western United; during the visit, Mr. Tapino informed White and a marketing executive that the film presentation made Cochiti Lake appear larger than it actually was; the marketing executive, whose name Judge could not recall, stated something to the effect that "by the time they discover that, we will have sold all of the lots and be out of there".
 
 
 81
 Great Western's primary objection to the motion to reopen and call Mr. Judge as a rebuttal witness was that this action was taken on the last day of trial and there would be no time available to Great Western to contradict Judge's testimony.
 
 
 82
 The trial court denied the tender of the rebuttal witness Judge on the basis that his testimony was questionable as rebuttal in nature inasmuch as no witness had previously testified concerning the dinner conversation in Denver. The court opined that purchasers should have called Mr. Judge as part of their case-in-chief. The record reflects that the trial court did not commit error in so ruling. Furthermore, there is no merit in purchasers' contention that the trial court employed a double standard in denying the rebuttal testimony of Mr. Judge after permitting Great Western to read a transcript of Mr. Thompson's testimony from a prior trial to the jury. Without detailing the distinction, suffice to say that purchasers were fully protected when the trial court authorized purchasers' counsel to depose Mr. Thompson in California at Great Western's expense before the prior trial testimony was read to the jury. The deposition taken by purchasers' counsel and the prior direct trial testimony were both read to the jury. No error was committed. No prejudice resulted therefrom. A trial court's denial of motions or objections to rulings will not be disturbed on appeal unless it affirmatively appears that the trial court abused its discretion. Fed.R.Civ.P. rule 52(a), 28 U.S.C.A.; White Motor Corp. v. Stewart, 465 F.2d 1085 (10th Cir.), cert. denied, 409 U.S. 1061, 93 S.Ct. 561, 34 L.Ed.2d 513 (1972).
 
 VII.
 
 83
 Purchasers argue that the trial court erred in refusing to give purchasers' requested instructions on constructive fraud and negligent representation. See Plaintiffs' requested instructions 2 and 3 [R., Supp.Vol. II, pp. 3-15].
 
 
 84
 We hold that the trial court did not err in refusing to tender instructions 2 and 3. Constructive fraud arises only when there exists a special confidential or fiduciary relationship between the parties to a transaction or contract; it is not actual fraud in the sense of actual evil design or contrivance. Faulkenberry v. Kansas City Southern Ry. Co., 602 P.2d 203 (Okl.1979); Blodgett v. Martsch, 590 P.2d 298 (Utah 1978); Snell v. Cornehl, 81 N.M. 248, 466 P.2d 94 (1970); Loucks v. McCormick, 198 Kan. 351, 424 P.2d 555 (1967); 37 Am.Jur.2d Fraud and Deceit Secs. 4, 15, 442 (1968 & Supp.1981); 37 C.J.S. Fraud Sec. 2 (1943 & Supp.1982). The presumption of fraud has been found in cases involving dealings and transactions of trust, such as agency, attorney and client, husband and wife, trustee and cestui que trust and guardian and ward. See 37 Am.Jur.2d Fraud and Deceit Sec. 442 at p. 604 (1968 & Supp.1981). No such confidential or fiduciary relationship existed between purchasers and Great Western.
 
 
 85
 Under the circumstances, the trial court correctly concluded that purchasers must prove that actual fraud was practiced upon them by Great Western. The trial court properly instructed the jury in this respect. [R., Supp.Vol. I, pp. 13-15]. The court correctly refused to give purchasers' requested instructions on negligent misrepresentation. In Snell v. Cornehl, supra, the plaintiff sued to compel specific performance of a contract, or, in the alternative, to recover damages for breach of the contract, for enforcement of landlord's lien and attorney fees. Following trial, the district court found that the plaintiff was aware of serious defects in the building but did not disclose them to defendant purchaser before the agreement was signed. The court found this concealment to constitute constructive fraud on the part of the plaintiff, entitling defendant to rescind the contract and to return of $2500, less a sum expended by plaintiff in restoring the property. The plaintiff alleged on appeal, inter alia, that rescission of the contract was not a proper remedy under the facts of the case and that the court erred in failing to grant plaintiff specific performance or damages. Pertinently, the court observed the different remedies a person may have in an action of this nature: "(1) he may declare a rescission and sue to recover the consideration already paid; (2) sue at law and recover damages which may be the natural and proximate consequences of the fraud; (3) sue to rescind the contract and for restoration of the status quo ante; or (4) recoup for damages in an action by defendant upon the purchase money obligation. Montoya v. Moore, 77 N.M. 326, 422 P.2d 363 (1967); Thrams v. Block, 43 N.M. 117, 86 P.2d 938 (1939)." 466 P.2d at pp. 95-96. [Emphasis supplied].
 
 
 86
 In Lacy v. Silva, 84 N.M. 43, 499 P.2d 361 (N.M.App.), cert. denied, 83 N.M. 37, 499 P.2d 355 (1972), the court held that negligent representation is an action upon which relief can be granted, that it is a tort determined by the general principles of the law of negligence and that it is an action separate from the action of fraud or deceit.
 
 
 87
 In Sims v. Craig, 96 N.M. 33, 627 P.2d 875, 877 (1981) the court quoted Maxey v. Quintana, 84 N.M. 38, 499 P.2d 356, 359 (N.M.App.), cert. denied, 83 N.M. 37, 499 P.2d 355 (1972) for this proposition:Negligent misrepresentation is available to a plaintiff who is "so circumstanced that he cannot or does not wish to rescind, and cannot meet the proof required for the tort of fraud or deceit [as a] ... remedy for damages caused by a misrepresentation short of fraud."
 
 
 88
 We have heretofore observed that the genesis of purchasers' complaints is that Great Western practiced actual fraud and deceit upon them, anchored to common law fraud and securities fraud allegations under the Securities Exchange Act of 1934 and rule 10b-5. In Everett v. Gilliland, 47 N.M. 269, 141 P.2d 326 (1943) the court said:
 
 
 89
 Here we have a different question. One of fraud and deceit; a failure to disclose material information, which induced the plaintiff to enter into the contract. The false representation and the contract were distinct and separable. The former was the inducement for the latter, and did not merge in the contract or deed.
 
 
 90
 141 P.2d at p. 332.
 
 
 91
 Finally, in light of our disposition, we elect not to reach Great Western's contention that the trial court erred in its interpretation of California law governing the scope of the written releases executed by purchasers in denying Great Western's motion for summary judgment. In Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) the Supreme Court alerted the lower federal courts to proceed cautiously in granting summary judgment in cases of this nature:
 
 
 92
 We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised.
 
 
 93
 368 U.S. at p. 473, 82 S.Ct. at 491. [Footnote omitted].
 
 
 94
 WE AFFIRM.
 
 
 
 [1]
 15 U.S.C.A. Sec. 45(a)(1) reads:
 (1) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful.
 15 U.S.C.A. Sec. 56(a)(1) reads:
 (a)(1) Except as otherwise provided in paragraph (2) or (3), if--
 (A) before commencing, defending, or intervening in, any civil action involving this chapter (including an action to collect a civil penalty) which the Commission, or the Attorney General on behalf of the Commission, is authorized to commence, defend, or intervene in, the Commission gives written notification and undertakes to consult with the Attorney General with respect to such action; and
 (B) the Attorney General fails within 45 days after receipt of such notification to commence, defend, or intervene in, such action;
 the Commission may commence, defend, or intervene in, and supervise the litigation of, such action and any appeal of such action in its own name by any of its attorneys designated by it for such purpose.
 (2) Except as otherwise provided in paragraph (3), in any civil action--
 (B) under section 57b of this title (relating to consumer redress); ....
 15 U.S.C.A. Sec. 57b(b) provides:
 The court in an action under subsection (a) shall have jurisdiction to grant such relief as the court finds necessary to redress injury to consumers or other persons, partnerships, and corporations resulting from the rule violation or the unfair or deceptive act or practice, as the case may be. Such relief may include, but shall not be limited to, rescission or reformation of contracts, the refund of money or return of property, the payment of damages, and public notification respecting the rule violation or the unfair or deceptive act or practice, as the case may be; except that nothing in this subsection is intended to authorize the imposition of any exemplary or punitive damages.